IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JARROD LOWREY,

     Plaintiff,

vs.                                                                    No. CIV 23-0868 JB/JMR

CANTRELL MOSLEY,
MISTY WILLIAMS,
JENNIFER BARTLESON,
JONATHAN CRESPIN,
JOSHUA WILCKEN,
B. SANCHEZ,
JOHN CASTANEDA, and
JENNIFER REGAN,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the County Defendants' Motion to Dismiss, filed October 26, 2023 (Doc. 19)("Motion"). Plaintiff Jarrod Lowrey appears pro se. For the reasons set out below, the Court grants the Motion.

## <u>PROCEDURAL BACKGROUND</u>

This case arises from a custody dispute involving Lowrey's child. <u>See</u> Complaint to Recover Damages for Deprivation of Civil Rights, filed October 3, 2023 (Doc. 1)("Complaint"). Lowrey asserts claims pursuant to 42 U.S.C. § 1983 and the New Mexico Civil Rights Act, N.M.S.A. §§ 41-4A-1 through 41-4A-13, against Defendants Jonathan Crespin, Joshua Wilcken, B. Sanchez, and John Castaneda ("County Defendants"). Complaint at 1-3. Crespin is a Sandoval County Sheriff Sergeant. <u>See</u> Complaint ¶ 6 at 2. Wilcken and Sanchez are Sandoval County Sheriff Deputies. <u>See</u> Complaint ¶¶ 7-8 at 2. Castaneda is a "Sandoval County Patrol Lieutenant

for Sandoval County Sheriffs."  Complaint ¶ 9 at 3.  Lowrey also asserts claims against Defendants Cantrell Mosley, Misty Williams, and Jennifer Bartleson ("CYFD Defendants").  Complaint at 1.

The County Defendants filed the Motion to dismiss Lowrey's claims: (i) regarding violations of Lowrey's rights under The First, Fourth, and Fourteenth Amendments to the Constitution of the United States for failure to state a claim and on the grounds of qualified immunity; and (ii) pursuant to the "New Mexico Civil Rights Act because the County Defendants are not viable Defendants under the Act."  Motion at 18.  Lowrey filed his Response in Opposition to County Defendant's [sic] Motion to Dismiss on November 13, 2023.  (Doc. 24)("Response"). Lowrey challenges the County Defendants' characterization of his Complaint by summarizing, without identifying, the factual allegations in the Complaint.  See Response ¶¶ 1-18 at 1-6.  Lowrey quotes from The Supreme Court of the United States and from the United States Courts of Appeals for various Circuits regarding the standards for qualified immunity.   Response ¶¶ 29-69 at 9-21. Lowrey states that: (i) "each count [of the Complaint] states sufficient facts to prove the plausibility of the alleged constitutional violation," Response ¶ 28 at 11; (ii) the "Plaintiff's complaint, exhibits, and documents show that certain defendants violated his clearly established constitutional rights," Response ¶ 41 at 12; and (iii) the "Plaintiff's complaint includes direct quotes from the defendants . . . that the defendants admitted to the constitutional violations," Response ¶ 56 at 17. Lowrey summarizes the County Defendants' actions without identifying the specific allegations in the Complaint that support his summaries of their actions.  Response ¶¶ 64-69 at 20-21.  The County Defendants filed the County Defendants' Reply in Support of County Defendants' Motion to Dismiss [Doc. 19]   on November 27, 2023.  (Doc. 31)("Reply").

- 2 -

I.      **Fourteenth Amendment Equal Protection**.

Lowrey asserts equal protection claims against Castaneda and Crespin.  See Complaint

at 3, 7.  The County Defendants assert:

> Plaintiff's Complaint is void of any facts in support of his Equal Protection claims.
> Accordingly, because Plaintiff has not alleged that either Defendant Castaneda or
> Defendant Crespin treated him differently than a similarly situated individual, the
> Court should find that both Defendants are entitled to qualified immunity on
> Plaintiff's Equal Protection claims.  Even if the Court finds that Plaintiff has pled
> sufficient facts to state a claim under the Equal Protection Clause, the Court should
> nonetheless grant Defendant Castaneda and Defendant Crespin qualified immunity
> because neither Defendant violated Plaintiff's clearly established rights based on
> the facts pled in Plaintiff's Complaint.

Motion at 7.  Lowrey does not point to any allegations in the Complaint showing that Castaneda

or Crespin treated Lowrey differently than a similarly situated individual.  See Response.

II.     **First Amendment Retaliation**.

Lowrey asserts First Amendment retaliation claims against Castaneda and Crespin.  See

Complaint at 3, 8.  Lowrey alleges:

> In direct contrast, the evidence shows that after actively suppressing 133 pages of
> evidence against defendant Regan from the Sandoval D.A., Castaneda, in
> retaliation, conspires on June 16, 2022 with CYFD solely based on the unreliable
> allegations of Ms. Regan, who Castaneda himself had charged with false report and
> harassment just months earlier.

Complaint ¶ 60 at 7.  None of the "Factual Allegations Which Support The Plausibility of Counts

6-11 Against Crespin" state that Crespin retaliated against Lowrey.  See Complaint ¶¶  63-104 at

9-12.

The County Defendants assert:

> Plaintiff's Complaint, however, does not include any factual allegations to support
> his First Amendment Retaliation claim. The factual allegations set forth in
> Plaintiff's Complaint demonstrate that the actions taken by County Defendants, to
> include Defendant Castaneda and Defendant Crespin, were motivated by their
> lawful duty to investigate crimes and to take action to address such crimes in
> accordance with the law. *See* NMSA 1978, § 29-1-1. For example, Plaintiff claims
> that Defendant Crespin made the following statement: "Because, here's the thing.

- 3 -

Tomorrow when we come back out here, and if your uncompliant, I'm not giving you a third option. I'm arresting you and I'm taking you straight jail." *Plaintiff's Complaint [Doc. No. 1], ¶ 98.* Defendant Crespin's actions were not motivated by Plaintiff's speech, but rather by his duty to enforce the law. Defendant Crespin did not threaten to arrest Plaintiff for any statement he made. To the contrary, Defendant Crespin told Plaintiff that he would be arrested if was "uncompliant" with the lawful orders issued to him. Even if the Court finds that the facts pled by Plaintiff establish that Defendant Castaneda's and Defendant Crespin's actions were motivated by his protected speech, Plaintiff has not pled any facts that would establish a causal connection between any retaliatory animus held by the County Defendants and his alleged injuries.

Motion at 8-9.

## III.    Fourth Amendment Search and Seizure.

Lowrey asserts claims for unreasonable search and seizure against Castaneda, Crespin,

Sanchez and Wilcken.  See Complaint at 3, 8, 34.  Lowrey alleges:

On June 16, 2022, the CYFD defendants made several calls to 911 requesting Sandoval County Sheriffs to perform a welfare check on Plaintiff's 6 year old child, by making various false allegations.

As the Sandoval Sheriffs Patrol Lieutenant, Castaneda, was on duty this day and dispatched 2 deputies to Plaintiff's private property in Rio Rancho at about 5:30 pm along with CYFD defendants.

….

Castaneda knew that CYFD did not acquire a court order and also knew that his deputies did not have a warrant to search Plaintiff's residence but sent them anyway.

….

At about 9 pm, Plaintiff and his son arrived back at his home.  Sanchez and Wilcken were staking out Plaintiffs [sic] home, and again trespass onto Plaintiff's property and walk right in his home.

Despite the lawful option of denying the Deputies access to his home without a warrant, Plaintiff politely obliged Deputy Sanchez with a walk through of his home which included a welfare check on Plaintiff's child who was peacefully eating his dinner at the table and getting ready for bed.

….

On the same day that Castaneda briefed Crespin, the CYFD Defendant's [sic] can be heard placing Sandoval County dispatch audio calls, as public records, calling in welfare checks on Plaintiff's child.

….

Sanchez can be seen on his and Wilcken's lapel camera videos trespassing onto Plaintiff's private property and breaking into Plaintiff's home on June 16, 2022 without a warrant or court order.

….

Wilcken can be seen on his and Sanchez's lapel camera videos trespassing onto Plaintiff's private property and breaking into Plaintiff's home on June 16, 2022 without a warrant or court order.

Complaint at 5-6, 9, 34.

The County Defendants state:

Based on the facts pled by Plaintiff, when Defendant Sanchez and Defendant Wilcken arrived on scene, they were aware that CYFD -- the agency in New Mexico charged with overseeing and securing child welfare -- had called 911 several times requesting a welfare check on a 6-year-old child located in Plaintiff's home. Unlike the circumstances present in [United States v. Najar, 451 F.3d 710, 717 (10th Cir. 2006)] where dispatch was unable to make contact with the individual who called 911, the Defendants in this case were acting on specific information that a 6 year old was in the home and at risk of harm. Although Plaintiff claims that the 911 calls from the CYFD Defendants "ma[de] various false allegations," Plaintiff's Complaint [Doc. No. 1], ¶ 31, the Tenth Circuit has recognized that "[p]olice officers are entitled to rely upon information relayed to them by other officers . . . " Olivas v. Woods, 209 F.3d 1179, 1190 (10th Cir. 2000); see also United States v. Hensley, 469 U.S. 221, 231 (1985) . . . ("[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another . . . officers, who must often act swiftly, cannot by expected to cross-examine their fellow officers about the foundation for the transmitted information."). Plaintiff has not pled any facts that would indicate that it was unreasonable for County Defendants to rely on the information transmitted during the several 911 calls made by CYFD Defendants.

After arriving to conduct a welfare check on the 6-year-old child who was allegedly in danger, Plaintiff claims that Defendant Sanchez and Defendant Wilcken "trespass[ed]" on the curtilage of his home and proceeded to "break[] into his home." Plaintiff's Complaint [Doc. No. 1], ¶ 36. First, Plaintiff's allegations set forth in paragraph 36 are legal conclusions that should be disregarded by the Court.

To the extent that the Court is willing to accept as true Plaintiff's allegations that Defendant Sanchez and Defendant Wilcken trespassed, the entry complied with the emergency assistance exigency exception. For purposes of this motion only, Defendant Sanchez and Defendant Wilcken entered Plaintiff's home to conduct a welfare check on a 6- year-old child after receiving "several" 911 calls from CYFD requesting the welfare check on the child. Defendant Sanchez and Defendant Wilcken entered the residence based on the reasonable grounds they had to believe that there was an immediate need to secure the child's welfare based on the numerous 911 calls from CYFD. Additionally, Plaintiff does not allege that County Defendants conducted any search of his residence beyond that which was needed to accomplish their objective of ensuring the child's safety. Plaintiff and the 6-year-old child at issue were not home during the events set forth above.

Eventually, at roughly 9:00 p.m. on June 16, 2022, Plaintiff's Complaint goes on to allege that he returned home with his son. Plaintiff's Complaint [Doc. No. 1], ¶ 39. Although Plaintiff alleges that Defendants Sanchez and Wilcken "again trespass[ed] onto Plaintiff's property and walk[ed] right in his home," he goes on to allege the following in the very next paragraph: "Despite the lawful option of denying the Deputies access to his home without a warrant, Plaintiff politely obliged Deputy Sanchez with a walk through of his home which included a welfare check on Plaintiff's child who was peacefully eating his dinner at the table and getting ready for bed." Id. at ¶ 40. As can been seen, Plaintiff admits that he consented to a warrantless search of his home.

In addition to his unlawful search claim, Plaintiff's Complaint also sets forth an illegal seizure claim. See Plaintiff's Complaint [Doc. No. 1], p. 3, p. 8, and p. 34. That said, Plaintiff has not alleged that he was seized by County Defendants. Because Plaintiff has not alleged that he was seized, Plaintiff's Fourth Amendment illegal seizure claim should be dismissed. To the extent that the Court finds that Plaintiff was detained or otherwise seized under Fourth Amendment, any such seizure was supported by reasonable suspicion and probable cause based on the facts pled in Plaintiff's Complaint.

Motion at 12-14.

## IV.   <u>Fourteenth Amendment Parental Interference.</u>

Lowrey asserts claims for interference with the parent/child relationship against Castaneda

and Crespin.  See Complaint at 3, 8.  Lowrey alleges:

On June 16, 2022, the CYFD defendants made several calls to 911 requesting Sandoval County Sheriffs to perform a welfare check on Plaintiff's 6 year old child, by making various false allegations.

As the Sandoval Sheriffs Patrol Lieutenant, Castaneda, was on duty this day and dispatched 2 deputies to Plaintiff's private property in Rio Rancho at about 5:30 pm along with CYFD defendants.

. . .

After completing the walk through, Deputy Sanchez deemed the child and home safe.

. . .

CYFD Defendant's [sic] Mosley and Bartleson then begin raging at the Deputies who were telling them that their welfare check they requested was not completed and that they have no further business on Plaintiff's property without a warrant or court order.  The Deputies then call their Sergeant Crespin.

Crespin can be viewed for the next 90 minutes making up various false allegations in order to effectuate the seizure of Plaintiff's child without an exigency.

. . .

Defendant Crespin . . . continues to try and seize the child anyway by threat of force at the direction of Sheriff Castaneda.

. . .

Plaintiff finally convinces Crespin that the child stays with Plaintiff but Crespin coerces Plaintiff to take child to La Petite Daycare the next day.

. . .

Plaintiff convinces Crespin that the child stays with dad but Crespin coerces Plaintiff to give CYFD the child . . . .

Complaint at 5-7, 11.

The County Defendants assert:

Although Plaintiff's Complaint recounts many conversations that took place between County Defendants, CYFD Defendants, and Plaintiff, he does not allege that County Defendants seized his son or otherwise prevented him from having contact with his son. In particular, Plaintiff's Complaint states that his son was "peacefully eating his dinner at the table" while Deputy Sanchez conducted a walk-through of the residence after Plaintiff invited the Deputy into his home. See id., ¶ 40. Moreover, the allegations set forth in Plaintiff's Complaint establish that Defendant Crespin went out of his way to safeguard Plaintiff's constitutional rights.

- 7 -

More specifically, Plaintiff claims that Defendant Crespin called into question CYFD's plan to seize Plaintiff's child, by stating the following: "The child, you have to understand, if we deem that the child is not in any type of danger, we can't do that without a court order. We can't just release him and say, here, because we feel like it, [w]e're going to take your child from you, you know, just because." Plaintiff's Complaint [Doc. No. 1], ¶ 79. After refusing to take any action regarding the child that night, Plaintiff was instructed to bring his child to a CYFD office the next day. See id. at ¶ 100.

Plaintiff has not pled any facts that would support a conclusion that County Defendants intended to deprive him of his relationship with his son. To the contrary, County Defendants refused to take his son into custody on June 16, 2022 and County Defendants instructed Plaintiff to bring his child to a CYFD office the next day so that CYFD could ensure his child's safety. Moreover, County Defendants did not place any undue burden on Plaintiff's relationship with his son. Lastly, Plaintiff has not pled any facts that would support a conclusion that County Defendants engaged in any conduct that could be deemed to be conscience shocking.

Motion at 15-16.

## V.    Fourteenth Amendment Suppression/Fabrication of Evidence.

Lowrey asserts claims for suppression evidence against Castaneda and Crespin, and for

fabrication of evidence against Crespin. See Complaint at 3-4, 7-8. Lowrey alleges:

Plaintiff contacted the Sandoval Sheriff's Office with the intent to file charges against Defendant Ms. Regan for 7 years worth of false reports to Rio Rancho Police Department, under oath perjuries to 13th Sandoval, and constant harassment through abuses of legal processes.

Plaintiff was contacted by Castaneda, who met with Plaintiff over multiple days and reviewed over 100 documents of self authenticating evidences supporting Plaintiff's allegations.

After reviewing all of the evidences and documents, Castaneda charged Ms. Regan with false report and harassment on July 21, 2021.

Plaintiff has filed text messages which show that Castaneda lied to Plaintiff for the next 8 months. The DA's office confirmed with Plaintiff that the received no such charges from Castaneda.

After dozens of calls to the DA's office and many messages to Castaneda, Castaneda finally sent over the charges to the CA's office . . .

. . .

Plaintiff was contacted by DA's Johnna Walker by phone on March 8, 2022. During this call Ms. Walker sent an email to Castaneda instructing him to collect all the evidence for the DA's office.

Exhibits show Castaneda confirmed to Plaintiff that he had received DA Walker's email.

. . .

It is a plain fact that Castaneda never did any further investigation into this matter, and ignored the DA's directions to send up Plaintiff's master report of evidences to them for prosecution of Regan.

. . .

Plaintiff was then shocked to receive a letter from DA's Walker saying that she had not received the requested evidences from Castaneda which Plaintiff had given him 10 months earlier . . . .

Due to Castaneda's dereliction, Plaintiff's case against Ms. Regan was then dropped by the DA.

. . .

Crespin, being fully briefed by Castaneda on the 133 pages of evidence which were used to charge Defendant Regan with false report and harassment, knowing that his two deputies had already deemed Plaintiff's child safe, knowing that Mosely lied to him about the allegations on the unsigned safety plan, knowing that RRPD verified that there was no active investigation into Plaintiff regarding his son, and knowing that the RRPD did not plan to schedule a safe house interview, suppressed that information and fabricated evidence to effectuate the unlawful seizure of the child.

Complaint at 4-5, 12.

The County Defendants assert:

Although Plaintiff's Complaint clearly takes issue with the manner in which Defendant Castaneda and Defendant Crespin investigated the matters at issue in Plaintiff's Complaint, Plaintiff has not alleged any facts that would support a conclusion that Defendant Castaneda and Defendant Crespin deliberately suppressed evidence or fabricated evidence. Furthermore, even if Defendant Castaneda or Defendant Crespin had deliberately suppressed evidence or fabricated evidence, Plaintiff's Fourteenth Amendment rights were not implicated because

Defendant Castaneda and Defendant Crespin did not initiate any legal process against Plaintiff that implicated his Fourteenth Amendment rights.

Motion at 17.

## VI.   <u>New Mexico Civil Rights Act</u>.

Lowrey asserts claims against Castaneda, Crespin, Sanchez and Wilcken pursuant to the New Mexico Civil Rights Act.   <u>See</u> Complaint at 3-4, 8, 34.   The New Mexico Civil Rights Act provides:

A. A public body or person acting on behalf of, under color of or within the course and scope of the authority of a public body shall not subject or cause to be subjected any resident of New Mexico or person within the state to deprivation of any rights, privileges or immunities secured pursuant to the bill of rights of the constitution of New Mexico.

B. A person who claims to have suffered a deprivation of any rights, privileges or immunities pursuant to the bill of rights of the constitution of New Mexico due to acts or omissions of a public body or person acting on behalf of, under color of or within the course and scope of the authority of a public body may maintain an action to establish liability and recover actual damages and equitable or injunctive relief in any New Mexico district court.

C. Claims brought pursuant to the New Mexico Civil Rights Act shall be brought exclusively against a public body. Any public body named in an action filed pursuant to the New Mexico Civil Rights Act shall be held liable for conduct of individuals acting on behalf of, under color of or within the course and scope of the authority of the public body.

D. Individuals employed by a public body shall be prohibited from using the New Mexico Civil Rights Act to pursue a claim arising from the individual's employment by the public body.

E. The remedies provided for in the New Mexico Civil Rights Act are not exclusive and shall be in addition to any other remedies prescribed by law or available pursuant to common law.

N.M.S.A. § 41-4A-3.

The County Defendants contend:

"Claims brought pursuant to the New Mexico Civil Rights Act shall be brought *exclusively* against a public body."  NMSA 1978, § 41-4A-3(C) (emphasis added).

- 10 -

> In other words, individual public employees cannot be sued under the New Mexico Civil Rights Act.  Plaintiff's Complaint names County Defendants, who were County employees at all relevant times, but Plaintiff has not named the public body that employs County Defendants.  Therefore, Plaintiff has failed to state a viable claim against County Defendants under the New Mexico Civil Rights Act and his claims under the Act should be dismissed with prejudice.

Motion at 17-18 (emphasis in original).

Lowrey states that he is asserting claims against the County Defendants in their official and personal capacities, and that "it is well established that Plaintiff's [NM]CRA claims against the Defendants in their official capacity are suits against the Sandoval County Sheriff's and also against Sandoval County CYFD, which in fact are public bodies as defined in the [NM]CRA." Response at 22.

The County Defendants assert:

> Plaintiff's argument ignores the requirements of NMSA 1978, § 4-46-1, which states that, "[i]n all suits or proceedings . . . against a county, the name in which the county shall . . . be sued shall be the board of county commissioners of the county of . . . ."  Pursuant to NMSA 1978, § 4-46-1, any lawsuit against Sandoval County or any of its employees under NMSA 1978, § 41-4a-3(C) can only be brought against the Board of County Commissioners of the County of Sandoval.  Based on Plaintiff's failure to bring his NMCRA claims against a public body, Plaintiff's NMCRA claims should be dismissed with prejudice.

Reply at 11-12.

## LAW REGARDING PRO SE LITIGANTS

When a party proceeds pro se, a court construes his or her pleadings liberally and holds them "to a less stringent standard than [that applied to] formal pleadings drafted by lawyers." Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

> [I]f the Court can reasonably read the pleadings to state a valid claim on which [the plaintiff] could prevail, it should do so despite [his or her] failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements.

Hall v. Bellmon, 935 F.2d at 1110.  The court, however, shall not "assume the role of advocate for the pro se litigant."  Hall v. Bellmon, 935 F.2d at 1110.  "[P]ro se status does not excuse the obligation of any litigant to comply with the fundamental requirements of the Federal Rules of Civil and Appellate Procedure."  Ogden v. San Juan Cnty., 32 F.3d 452, 455 (10th Cir. 1994).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When considering a rule 12(b)(6) motion, a court must accept as true all of the complaint's well-pled factual allegations, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the nonmoving party's favor.  See Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).  To survive a motion to dismiss, a complaint must contain sufficient facts that, if assumed to be true, state a claim for relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Thus, a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. at 678.  If "the scope of the allegations in a

complaint . . . are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)).

## LAW REGARDING § 1983 LIABILITY

42 U.S.C. § 1983 creates a cause of action for a plaintiff to seek money damages from State officials who have violated his or her constitutional or statutory rights.  See 42 U.S.C. § 1983 ("§ 1983").  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988). Individual, non-supervisory defendants may be liable if they know or reasonably should know that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012).  While there is no respondeat superior liability under § 1983, see Ashcroft v. Iqbal, 556 U.S. at 675, the United States Court of Appeals for the Tenth Circuit recognizes that non-supervisory defendants may be liable if they know or reasonably should know that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012).

## LAW REGARDING EQUAL PROTECTION CLAIMS

The Equal Protection Clause of the Fourteenth Amendment guarantees that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause 'keeps governmental decision makers from treating

- 13 -

differently persons who are in all relevant respects alike.'" Soskin v. Reinertson, 353 F.3d at 1247 (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)). "The Clause 'creates no substantive rights. Instead, it embodies a general rule that states must treat like cases alike but may treat unlike cases accordingly.'" Teigen v. Renfrow, 511 F.3d at 1083 (quoting Vacco v. Quill, 521 U.S. 793, 799 (1997)).

Generally, to state a claim under § 1983 for violation of the Equal Protection Clause, a plaintiff must show that he or she is a member of a class of individuals that is being treated differently from similarly situated individuals who are not in that class. See SECSYS, LLC v. Vigil, 666 F.3d 678, 688 (10th Cir. 2012). The plaintiff must demonstrate that the "'decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of' the law's differential treatment of a particular class of persons." SECSYS, LLC v. Vigil, 666 F.3d at 685 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. at 279). In other words, "a discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action." SECSYS, LLC v. Vigil, 666 F.3d at 685.

A State actor generally can be subject to liability only for its own conduct under 42 U.S.C. § 1983. See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)). At least in the Tenth Circuit, however, under some circumstances, a third party's harassment can subject a supervisor or municipality to liability for violation of the equal-protection clause -- not for the harasser's conduct, per se, but for failure to take adequate steps to stop it. See Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1249-51 (10th Cir. 1999). The plaintiff "must demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official

with final policy making authority." Murrell v. Sch. Dist. No. 1, 186 F.3d at 1249 (citing Randle v. City of Aurora, 69 F.3d 441, 446-50 (10th Cir. 1995)).  The failure to prevent discrimination before it occurs is not actionable.  See Murrell v. Sch. Dist. No. 1, 186 F.3d at 1250 n.7.

## LAW REGARDING THE FIRST AMENDMENT

The First Amendment states: "Congress shall make no law . . . abridging the freedom of speech, or of the press."  U.S. Const. amend. I.  The First Amendment secures the "freedom of expression upon public questions."  New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964).  According to the Honorable Louis Brandeis, Associate Justice of the Supreme Court, "[t]hose who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberate forces should prevail over the arbitrary."  Whitney v. California, 274 U.S. 357, 375 (1927).  The Constitution's Framers "valued liberty both as an end and as a means," and "believed liberty to be the secret of happiness and courage to be the secret of liberty."  Whitney v. California, 274 U.S. at 375.  They firmly believed that the "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth," because, without them, "discussion would be futile."  Whitney v. California, 274 U.S. at 375.  Justice Brandeis notes, moreover, that the values that the First Amendment protects are essential to the operation of the democracy that the Constitution creates.  See Whitney v. California, 274 U.S. at 375.  Robust public discussion, in his view, is a "political duty" and is a "fundamental principle of the American government."  Whitney v. California, 274 U.S. at 375.  Constitutional protections of freedom of expression and of the press, therefore, are "fashioned to assure unfettered interchange of ideas for the bringing out of political and social changes desired by the people."  Roth v. United States, 354 U.S. 476, 484 (1957).

Like most Constitutional guarantees, the First Amendment, however, is not an absolute bar

on government intervention.  In effect, "no law" does not in practice mean "no law."  U.S. Const. amend. I.  See Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573 (2002)(stating that, "'as a general matter, the First Amendment means that government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content,'" but "this principle, like other First Amendment principles, is not absolute" (quoting Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 65 (1983)); Dennis v. United States, 314 U.S. 494, 503 (1951)(noting that the First Amendment does not protect an "unlimited, unqualified right," because the "societal value of speech must, on occasion, be subordinated to other values and considerations").  Although the First Amendment speaks in absolutist terms, courts long have recognized that governments Constitutionally can restrict speech and the press under certain conditions.  See Holder v. Humanitarian Law Project, 561 U.S. 1, 26-29 (2010).  The Honorable Oliver Wendell Holmes, Associate Justice of the Supreme Court, notes in his oft-quoted example: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic."  Schenck v. United States, 249 U.S. 47, 52 (1919).  Indeed, not all speech is protected speech, and First Amendment jurisprudence has developed various categorizations of protection based on the speech.  See Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942)("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."); Miller v. California, 413 U.S. 15, 23 (1973)("This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment.").  This categorization is borne from a recognition that "not all speech is of equal First Amendment importance."  Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758 (1985).  The extent to which the government may limit access to information or restrict speech "depends on the nature of the forum."  Cornelius v. NAACP Legal

Def. and Educ. Fund, Inc., 473 U.S. 788, 797 (1985).  See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)(concluding that certain content-neutral time, place, and manner restrictions are constitutional).

The First Amendment's speech and press protections, moreover, limit both State and federal government action.  See Gitlow v. New York, 268 U.S. 652, 666 (1925); Near v. Minnesota, 283 U.S. 697, 628 (1931).  The First Amendment limits "government regulation of private speech" and not government speech or purely private speech regulations.  Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467 (2009).  The First Amendment does not compel either the government or private persons to supply information.  See Shero v. City of Grove, 510 F.3d 1196 (10th Cir. 2007).  See In re Santa Fe Natural Tobacco Co. Mkting & Sales Practices and Products Liab. Litig., 388 F. Supp. 3d 1087, 1168-73 (D.N.M. Dec. 21, 2017)(Browning, J.).

## RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

The Supreme Court has long held that the Fourth Amendment "protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject

of Fourth Amendment protection." <u>Katz v. United States</u>, 389 U.S. 347, 351 (1967). A "search" generally occurs when an individual "'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,'" but an official intrudes into that private sphere. <u>Carpenter v. United States</u>, 585 U.S. 296, 296 (2018)(quoting <u>Smith v. Maryland</u>, 442 U.S. 735, 740 (1979)). <u>See</u> <u>United States v. Dahda</u>, 2021 WL 1712570, at * 6 (10th Cir. 2021 April 30, 2021)( "The 'basic purpose' of the Amendment 'is to safeguard the privacy and security of individuals against arbitrary invasion by governmental officials.' (quoting <u>Carpenter v. United States</u>, 585 U.S. 296, 303)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." <u>United States v. Harmon</u>, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). <u>See</u> <u>United States v. McHugh</u>, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398 (1978)). The Supreme Court has stated, that, in the law enforcement context, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)(footnotes omitted).

### 1. <u>United States v. Jones</u>.

The defendant in <u>United States v. Jones</u> was suspected of drug trafficking, and a joint Federal Bureau of Investigation and District of Columbia Metropolitan Police Department task force obtained a warrant authorizing installation in Washington, D.C., within ten days, of a Global Positioning System ("GPS") device to the defendant's car. <u>See</u> <u>United States v. Jones</u>, 565 U.S. at 402. On the eleventh day, task force agents attached the GPS device to the bottom of the

defendant's car while the car was in Maryland.  The agents then used the GPS device to track the defendant's movements over the next twenty-eight days, replacing the battery once, and collecting over two-thousand pages of data sent from the device.  See United States v. Jones,565 U.S. at 402.

The Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the majority, in which Chief Justice Roberts and Justices Kennedy, Thomas, and Sotomayor joined, hold that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'"  United States v. Jones, 565 U.S. at 404.  Justice Scalia reasons that the United States' conduct is a Fourth Amendment search, because the United States trespassed on a Constitutionally protected area.  See United States v. Jones, 565 U.S. at 404 ("The Fourth Amendment provides . . . that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'  It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment.").  Such a physical intrusion, Justice Scalia opines, would have come within the Framers' intended definition of a "search":  "It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information.  We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted.  United States v. Jones, 565 U.S. at 404-05.  Justice Scalia reconciles the Supreme Court's conclusion that attaching a GPS device to track a Jeep in plain view was a Fourth Amendment search with New York v. Class, 475 U.S. 106 (1986), in which the Supreme Court concludes that a visual examination of the outside of a vehicle while in plain view does not constitute a search, by noting that "[i]n Class itself we suggested that this [physical invasion] would make a difference, for we concluded that

an officer's momentary reaching into the interior of a vehicle did constitute a search." <u>United States v. Jones</u>, 565 U.S. at 410.

Justice Scalia reasons that the Fourth Amendment's text supports taking a property-law-based approach to determine whether there is a search, but did not shy away from the fact that, in recent history, the Supreme Court has deviated from this approach:

> The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to "the right of the people to be secure against unreasonable searches and seizures"; the phrase "in their persons, houses, papers, and effects" would have been superfluous.
>
> Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. <u>Kyllo v. United States</u>, 533 U.S. [at] 31 . . . . Our later cases, of course, have deviated from that exclusively property-based approach. . . . [and] have applied the analysis of Justice Harlan's concurrence in [<u>Katz v. United States</u>], which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy," <u>id.</u>, at 464 . . . .

<u>United States v. Jones</u>, 565 U.S. at 406.  The United States had contended that, under the "Harlan standard" -- i.e., the <u>Katz v. United States</u> reasonable-expectation-of-privacy approach -- "no search occurred here, since Jones had 'no reasonable expectation of privacy' in the area of the Jeep accessed by the Government agents (its underbody) and in the locations of the Jeep on the public roads, which were visible to all." <u>United States v. Jones</u>, 565 U.S. at 406 (internal quote has no citation).   Justice Scalia concludes, however, that the Supreme Court "need not address the Government's contentions" in relation to the <u>Katz v. United States</u> reasonable-expectation-of-privacy test analysis, because the trespass-based search approach, which existed at the time of the Fourth Amendment's adoption, disposes of the issue:

> . . . Jones's Fourth Amendment rights do not rise or fall with the <u>Katz</u> formulation. At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." <u>Kyllo[ v. United States</u>, 533 U.S. at 34]. As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government

trespass upon the areas ("persons, houses, papers, and effects") it enumerates.  Katz did not repudiate that understanding.  Less than two years later the Court upheld defendants' contention that the Government could not introduce against them conversations between *other* people obtained by warrantless placement of electronic surveillance devices in their homes.  The opinion rejected the dissent's contention that there was no Fourth Amendment violation "unless the conversational privacy of the homeowner himself is invaded." Alderman v. United States, 394 U.S. 165, 176 . . . (1969).  "[W]e [do not] believe that Katz, by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home . . . ." Id., at 180. . .

United States v. Jones, 565 U.S. at 408 (ellipses added)(footnotes omitted).

## 2.    **Florida v. Jardines.**

In Florida v. Jardines, 569 U.S. 1 (2013), Justice Scalia holds that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search. 569 U.S. at 11.  Justices Thomas, Ginsburg, Sotomayor, and Kagan joined Justice Scalia's majority opinion in Florida v. Jardines.  The Honorable Elena Kagan, Associate Justice of the Supreme Court, filed a separate concurring opinion, in which Justices Ginsburg and Sotomayor join, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full."  569 U.S. at 16 (Kagan, J., concurring).  Justice Alito dissented, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer join his opinion.

In Florida v. Jardines, the Miami-Dade, Florida, police department and the Drug Enforcement Administration received a tip that the defendant Jardines was growing marijuana in his home, and then sent a surveillance team to Jardines' home.  See Florida v. Jardines, 569 U.S. at 3.  Observing nothing of note in the first fifteen minutes watching the home, two detectives approached the home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs by alerting the detectives with behavioral changes.  See Florida v. Jardines,

569 U.S. at 3.  As the dog approaches Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point." Florida v. Jardines, 569 U.S. at 3.  The dog's handler then immediately left the porch, and told the other agents and officers at the scene that there is a positive alert for drugs, at which time the officers apply for and receive a search warrant for the residence, the execution of which revealed marijuana plants. See Florida v. Jardines, 569 U.S. at 3.  Jardines is arrested for trafficking in marijuana and moves to suppress the evidence based on an illegal search. See Florida v. Jardines, 569 U.S. at 3.

Justice Scalia holds that the use of a drug-sniffing dog is a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

Florida v. Jardines, 569 U.S. at 5.  Justice Scalia notes that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." Florida v. Jardines, 569 U.S. at 6 (quoting Oliver v. United States, 466 U.S. at 176).  Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text." Florida v. Jardines, 569 U.S. at 6.

Justice Scalia holds that "the officers' investigation took place in a constitutionally protected area," the home, because the front porch is the home's curtilage. Florida v. Jardines,

569 U.S. at 7.  Justice Scalia then "turn[s] to the question of whether it was accomplished through an unlicensed physical intrusion," <u>Florida v. Jardines</u>, 569 U.S. at 5, and reasons:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [<u>California v. Ciraolo</u>, 476 U.S. 207, 213 (1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas. In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner." <u>Id</u>. <u>Entick v. Carrington</u>, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, <u>Boyd v. United States</u>, 116 U.S. 616, 626 . . . (1886)[, abrogated by <u>Warden, Md. Penitentiary v. Hayden</u>, 387 U.S. 294 (1967)], states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." 2 Wils. K.B., at 291. As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so. He had not.

<u>Florida v. Jardines</u>, 569 U.S. at 7-8.  Justice Scalia notes that, while society recognizes an implicit license which "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," he concludes that "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that."

<u>Florida v. Jardines</u>, 569 U.S. at 9 (emphasis in original).  Justice Scalia explains:

> An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to -- well, call the police.  The scope of a license -- express or implied -- is limited not only to a particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

<u>Florida v. Jardines</u>, 569 U.S. at 3.

Justice Scalia further notes that, in <u>United States v. Jones</u>, the Supreme Court concludes that "[t]he <u>Katz</u> reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment, and so it is unnecessary to consider [the test under <u>Katz v. United States</u>] when the government gains evidence by physically intruding on constitutionally protected areas."  <u>Florida v. Jardines</u>, 569 U.S. at 11 (quoting <u>United States v. Jones</u>, 565 U.S. at 409).  Because the Supreme Court concludes that the conduct is a Fourth Amendment search under the trespass-based analysis, therefore, it holds that it is unnecessary to consider whether the conduct amounts to a search under the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis:

> Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under <u>Katz</u>. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

<u>Florida v. Jardines</u>, 569 U.S. at 11.

### 3. <u>Fourth Amendment Standing</u>.

The Tenth Circuit refers to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of "standing."  <u>United States v. Creighton</u>, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."); <u>United States v. Poe</u>, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing <u>United States v. Rubio-Rivera</u>, 917 F.2d 1271, 1274 (10th Cir. 1990)); <u>United States v. Shareef</u>, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he

or she has a reasonable expectation of privacy in the area being searched."). Accordingly, the Court, tracing the Tenth Circuit's language, refers to this test as one of standing. See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121). The Supreme Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test now has expressly been designated a substantive Fourth Amendment analysis alongside the trespass-based Fourth Amendment analysis, rather than a distinct analysis under the rubric entitled standing.

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproves of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." 439 U.S. at 133. Dispensing with this label, the Supreme Court notes:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain Jones[ v. United States, 362 U.S. 257 (1960, overruled by United States v. Salvucci, 448 U.S. 83 (1980)]' use of standing in Fourth Amendment analysis. Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant. However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," Simmons v. United States, 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. We can think of no decided cases of this Court that

- 25 -

would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in Jones [v. United States] also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks. 362 U.S., at 261, 263, 265 . . . .

439 U.S. at 138-39. The Supreme Court emphasized:

[N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . . But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40. In Minnesota v. Carter, the Supreme Court recognizes that Rakas v. Illinois put an end to the Fourth Amendment standing analysis as separate from the substantive Fourth Amendment search analysis:

The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in Rakas . . . . Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." Id., at 140 . . . .

Minnesota v. Carter, 525 U.S. at 87-88. The Supreme Court notes that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same and that Katz v. United States' reasonable-expectation-of-privacy analysis now is a substantive Fourth Amendment test, as opposed to a standing test. See Rakas v. Illinois, 439 U.S. at 139.

- 26 -

### 4.    Whether a Fourth Amendment Search Occurs.

A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government, to collect information, violates a person's subjective expectation of privacy that society recognizes as reasonable.  See United States v. Jones, 565 U.S. at 406.  "[T]he Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." United States v. Jones, 565 U.S. at 409 (emphasis in original)(citing Alderman v. United States, 394 U.S. 165, 176 (1969); Soldal v. Cook Cnty., 506 U.S. 56, 64 (1992)).

### a.    Trespass-Based Analysis.

The Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 569 U.S. at 1 (quoting United States v. Jones, 565 U.S. at 406 n.3).  "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation."  United States v. Jones, 565 U.S. at 408 n.5 (Scalia, J.)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).

In determining whether a search has occurred, "[t]respass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 565 U.S. at 408 n.5.  The Supreme Court also notes that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection."  Bond v. United States, 529 U.S. 334, 337 (2000).  Moreover, the Supreme Court in Florida v. Jardines suggests that the trespass-based analysis applies only when the trespass occurs in one of the four places or things that the Fourth Amendment lists:

The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . . But when it comes to the Fourth Amendment, the home is first among equals.

Florida v. Jardines, 569 U.S. at 6.

### b.   Katz v. United States' Reasonable-Expectations-of-Privacy Search Test Remains Good Law.

The Court notes that, in light of the Supreme Court's decisions in Florida v. Jardines and United States v. Jones, both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constitutes a Fourth Amendment search using the trespass-based approach, "the question arises whether the Katz v. United States reasonable-expectation-of-privacy test is still good law." United States v. Alabi, 943 F. Supp. 2d at 1242 (citing Minnesota v. Carter, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)).   Justice Scalia consistently has criticized this "notoriously unhelpful test":

In my view, the only thing the past three decades have established about the Katz test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in Katz . . .) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" [Katz v. United States, 389 U.S. at 361], bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable. When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has occurred (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment. That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'" Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the Constitution would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

Minnesota v. Carter, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original)(internal citations omitted).[1]  In both United States v. Jones and Florida v. Jardines, however, Justice Scalia, writing for the majority, never states that the Supreme Court was substituting the trespass-based analysis for Katz v. United States' reasonable-expectation-of-privacy analysis.  Rather, his majority opinions asserts that the Katz v. United States reasonable-expectation-of-privacy analysis adds to the trespass-based analysis.  See Florida v. Jardines, 569 U.S. at 11 ("The Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment." (emphasis in original))(quoting United States v. Jones, 565 U.S. at 408).  The Court concludes in United States v. Alabi that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the Katz v. United States reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach."  United States v. Alabi, 943 F Supp. 2d 1201, 1243 (D.N.M. 2013)(Browning, J.)

In June, 2013, Justice Scalia dissents from the Supreme Court's decision in Maryland v. King, 569 U.S. 435 (2013), in which the Supreme Court holds that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure," Maryland v. King 569 U.S. at 465.  Justice Scalia criticizes the majority's opinion for analogizing DNA testing to taking an arrestee's photograph by citing to Katz v. United States and noting that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'" Maryland v. King, 569 U.S. at 477 (Scalia, J., dissenting).  Justice Scalia also notes that a person's "privacy-related concerns" in their body are weighty:

---

[1]The Honorable Clarence Thomas, Associate Justice, was the only other Justice to join Justice Scalia's Minnesota v. Carter concurrence.

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the <u>body</u> is at stake? (The Fourth Amendment lists "persons" first among the entities protected against unreasonable searches and seizures.).

<u>Maryland v. King</u>, 569 U.S. at 469 (Scalia J., dissenting)(emphasis in original). Justice Scalia also

suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school. Perhaps the construction of such a genetic panopticon is wise. But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

<u>Maryland v. King</u>, 569 U.S. at 469 (Scalia J., dissenting). The Court therefore concludes that

Justice Scalia and the Supreme Court still may rely on a person's privacy expectation when

determining whether a search is reasonable for Fourth Amendment purposes, although Justice

Scalia may not turn to the expectations prong until he runs the facts through the trespass prong.

See <u>Apodaca v. New Mexico Adult Probation and Parole</u>, No. CIV 13-0113 JB/SMV, 2014 WL

712588, at *14 (D.N.M. Feb. 13, 2014)(Browning, J.)(reaching this conclusion).

### c.    **<u>Katz v. United States' Reasonable-Expectations-of-Privacy Analysis</u>.**

"'Fourth Amendment rights are personal rights which, like some other constitutional rights,

may not be vicariously asserted.'" <u>Rakas v. Illinois</u>, 439 U.S. at 133-34 (quoting <u>Alderman v.

United States</u>, 394 U.S. at 174). "A district court cannot suppress evidence unless the movant

proves that a search implicates <u>personal</u> Fourth Amendment interests." <u>United States v. Jones</u>, 44

F.3d 860, 871 (10th Cir. 1995)(emphasis in original). "'[N]o interest legitimately protected by the

Fourth Amendment' is implicated by governmental investigative activities unless there is an

intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his

property within a constitutionally protected area.'"  United States v. Miller, 425 U.S. 435, 440

(1976)(quoting Hoffa v. United States, 385 U.S. 293, 301-02 (1966)).[2]  The Tenth Circuit notes

that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the

---

[2]The Court previously has stated: "[T]he Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area.'"  Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.)(quoting Katz v. United States, 389 U.S. at 351). In support for this proposition, the Court relies on the majority's decision in Katz v. United States, where the Supreme Court states that focusing on whether the area is a "constitutionally protected area . . . . deflects attention from the problem," as it focuses attention on the place, rather than the person:

> Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls. The petitioner has strenuously argued that the booth was a "constitutionally protected area." The Government has maintained with equal vigor that it was not. But this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. See Lewis v. United States, 385 U.S. 206, 210 [1966]; United States v. Lee, 274 U.S. 559, 563 . . . (1927). But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. See Rios v. United States, 364 U.S. 253 . . . [1960]; Ex parte Jackson, 96 U.S. 727, 733 . . . [1877].

Katz v. United States, 389 U.S. at 351-52. The Supreme Court has changed course.  In Florida v. Jardines, the particular place at which the search occurs weighs heavily on the Supreme Court's holding, reasoning that "[t]he [Fourth] Amendment establishes [as] a simple baseline . . . protections 'when the Government does engage in a physical intrusion of a constitutionally protected area.'"  Florida v. Jardines, 569 U.S. at 5 (ellipses added)(emphasis in original)(quoting United States v. Knotts, 460 U.S. 276, 286 (1983)(Brennan, J., concurring)).  See United States v. Jones, 565 U.S. at 407 ("Katz did not erode the principle 'that, when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment. . . . Katz did not narrow the Fourth Amendment's scope.'" (ellipses added)(citing United States v. Knotts, 460 U.S. at 407-08).  The Court thus concludes that, while it may be true that the analysis does not turn on the place searched, the Court's prior statement -- "the Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area,'" Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d at 1219 -- may no longer accurately reflect the Supreme Court's recent reversion to property-based analysis as a Fourth Amendment analysis baseline.

premises searched." United States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)). Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests still depends, after conducting a trespass-based analysis, on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable." Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.).

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123). The Supreme Court thus has recognized that, rather than determining whether law enforcement conduct was a search, it sometimes proves easier to "assess[] when a search is not a search." Kyllo v. United States, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in Katz v. United States. Katz involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth. As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33. The Supreme Court thus articulates the Katz v. United States rule -- which Professor Wayne R. LaFave notes is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed. 2004)(citing Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 383-388 (1974)(criticizing this formulation of the standard and explaining that "the common formula for Katz fails to capture Katz at any point because the Katz decision was written to resist captivation in any formula") -- as follows: "[A]

- 32 -

Fourth Amendment search does <u>not</u> occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" <u>Kyllo v. United States</u>, 533 U.S. at 33 (emphasis in original)(quoting <u>California v. Ciraolo</u>, 476 U.S. at 211).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" <u>United States v. Jones</u>, 565 U.S. at 408.  <u>See</u> <u>United States v. Harmon</u>, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law . . . .").  In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." <u>Rakas v. Illinois</u>, 439 U.S. at 143 & n.12.  While ownership or lawful possession is not determinative under the <u>Katz v. United States</u> reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession." <u>United States v. Arango</u>, 912 F.2d 441, 445-46 (10th Cir. 1990).

### i.      Reasonable Government Searches.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable. <u>Kentucky v. King</u>, 563 U.S. 452, 459 (quoting <u>Brigham City v. Stuart</u>, 547 U.S. 398, 403 (2006)).  <u>See</u> <u>Samson v. California</u>, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to

determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  United States v. Knights, 534 U.S. at 121 (citing Terry v. Ohio, 392 U.S. 1 (1968)). The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).   "Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court holds that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.   In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.   Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the Tenth Circuit look to the individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. 112, 119-120 (2001)(noting that the petitioner has a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation is to consent to search of his apartment without notice or probable cause, and because he is clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, noting: "Those who have never been convicted of a felony are the last distinct category.   What is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population."); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of an inmate's diminished privacy rights . . . .").

## RELEVANT LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters;

(ii) investigative stops; and (iii) arrests. See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000). See also Dorato v. Smith, 108 F. Supp. 3d. 1064, 1118 (D.N.M. 2015)(Browning, J.)(noting that investigative stops are seizures); United States v. Young, 347 F. Supp. 3d 747, 770 (D.N.M. 2018)(Browning, J.)(describing an arrest as a seizure). "A police officer may seize someone either by physical force or a show of authority." United States v. Roberson, 864 F.3d 1118, 1121 (10th Cir. 2017)(citing United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir. 2010)). "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. 621, 625-26 (1991)). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. at 628). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting United States v. Drayton, 536 U.S. 194, 201 (2002)). See California v. Hodari D., 499 U.S. at 627-28 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. at 554)). The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064 (citing United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).

1.      **Consensual Encounters**.

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b) (6th ed. 2024).

**LAW REGARDING PROCEDURAL DUE PROCESS CLAIMS**

The Tenth Circuit prescribes a two-step inquiry for determining whether an individual's procedural due process rights are violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).  "[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake."  Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972)(internal quote has no citation).  "'Liberty' and 'property' are broad and majestic terms.  They are among the '[g]reat [constitutional] concepts . . . purposely left to gather meaning from experience."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting Nat'l Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)). The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money.  By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of

formal constraints imposed by the criminal process."  Bd. of Regents of State Colls. v. Roth, 408

U.S. at 571-72.   "Yet, while the Court has eschewed rigid or formalistic limitations on the

protection of procedural due process, it has at the same time observed certain boundaries" for "the

words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be

given some meaning."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme

Court has stated the following:

> Without doubt, it denotes not merely freedom from bodily restraint but also the
> right of the individual to contract, to engage in any of the common occupations of
> life, to acquire useful knowledge, to marry, to establish a home and bring up
> children, to worship God according to the dictates of his own conscience, and
> generally to enjoy those privileges long recognized . . . as essential to the orderly
> pursuit of happiness of free men.  In a Constitution for a free people, there can be
> no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.  "The Fourteenth Amendment's procedural

protection of property is a safeguard of the security of interests that a person has already acquired

in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property

interests, as already explained, can include "real estate, chattels, or money," but they "may take

many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory
> and administrative standards defining eligibility for them has an interest in
> continued receipt of those benefits that is safeguarded by procedural due process.
> Goldberg v. Kelly, 397 U.S. 254 [(1970)].  See Flemming v. Nestor, 363 U.S. 603,
> 611 [(1960)].  Similarly, in the area of employment, the Court has held that a public
> college professor dismissed from an office held under tenure provisions, Slochower
> v. Bd. of Education, 350 U.S. 551 [(1956)], and college professors and staff
> members dismissed during the terms of their contracts, Wieman v. Updegraff, 344
> U.S. 183 [(1952)], have interests in continued employment that are safeguarded by
> due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly

must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").  "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976).  The Supreme Court has explained that

> the root requirement of the Due Process Clause [is] that an individual be given an
> opportunity for a hearing before he is deprived of any significant property interest.

This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.

. . . .

[T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted). The United States

Court of Appeals for the Second Circuit has stated:

The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on:

(i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the

procedures already guaranteed, and whether additional procedural safeguards would prove

valuable; and (iii) the government's interest and the burdens that additional procedures might

impose. See Mathews v. Eldridge, 424 U.S. at 335. For example, "[w]here . . . the state must act

quickly, a meaningful postdeprivation hearing is adequate." Clark v. City of Draper, 168 F.3d

at 1189. See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that

removal of a child from parents' custody requires predeprivation hearing "except for extraordinary

situations where some valid governmental interest is at stake that justifies postponing the hearing

until after the event").

The Court has considered procedural due process violations on multiple occasions.  See, e.g., A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692, 2015 WL 13668431, at *37-43 (D.N.M. December 7, 2015)(Browning, J.)("Youngers").  For example, in Youngers, the Court concludes that the New Mexico Department of Health denies a woman with developmental disabilities due process when it deprives her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it affords her no process for the deprivation.  See Youngers, 2015 WL 13668431, at *37-43.  The Court also has concluded that a tenured city employee is not denied due process when the city fires him, because the city affords him a hearing after the firing, and the employee's due process claim is in reaction to the city's appeal of the hearing board's decision.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").  See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d 1189,  1215 (D.N.M. 2009)(Browning, J.)(denying due process claims where a State employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers"); Camuglia v. City of Albuquerque, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.)("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner."), aff'd, 448 F.3d 1214, 1220-21 (10th Cir. 2006).  The Court has concluded that a student's complaints against a university's allegedly inadequate procedures for addressing sexual misconduct states a valid due process claim, but that a university's procedures may, upon a full factual record, satisfy due process dictates.  See Lee v. Univ. of New Mexico, 500 F. Supp. 3d 1181, 1235 (D.N.M. 2020)(Browning, J.)("[U]nder the three Mathews v. Eldridge factors, none of Lee's alleged procedural deficiencies

substantially prejudice him [on summary judgment], and the Defendants have satisfied their obligations under the Due Process Clause to afford Lee notice and an opportunity to be heard."). See also Lee v. Univ. of New Mexico, 449 F. Supp. 3d 1071, 1122 (D.N.M. 2020)(Browning, J.)("Lee has a protected property interest in his continued enrollment at UNM. Further, Lee's allegations plausibly support a conclusion that the procedures used in UNM's sexual misconduct investigation do not comport with Due Process.").

## LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

There exist two substantive due process claims:

> In Halley v. Huckaby, 902 F.3d 1136 (10th Cir. 2018), we recently recounted that the Supreme Court recognizes two types of substantive due process claims: (1) claims that the government has infringed a "fundamental" right, see, e.g., Washington v. Glucksberg, 521 U.S. 702, 721-22 . . . (1997)(assessing asserted right to assisted suicide); and (2) claims that government action deprived a person of life, liberty, or property in a manner so arbitrary it shocks the judicial conscience, see, e.g., City of Sacramento v. Lewis, 523 U.S. 833, 846 . . . (1998)(examining a high-speed police chase). Halley, 902 F.3d at 1153. "[W]e apply the fundamental-rights approach when the plaintiff challenges legislative action, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious executive action." Id.

Doe v. Woodard, 912 F.3d 1278, 1300 (10th Cir. 2019)(ellipses added). "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 195 (1989). The Due Process Clause is not a guarantee of a minimal level of safety and security. See DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.

1.    **Exceptions to the General Rule.**

There are, however, two exceptions to this general rule that States need not protect against private actors' deprivation of liberty or property interests. The first exception -- the special-relationship doctrine -- arises when the state has a custodial relationship with the victim, which

triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a State also may be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  "If either the special- relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'"  Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2.    Special-Relationship Exception.

The first exception to the general principle that a State's negligent failure to protect an individual cannot trigger liability under the Due Process Clause is the special-relationship doctrine. Under this exception, a plaintiff must show that he or she was involuntarily committed to State custody to establish a duty to protect under the special-relationship doctrine.  See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)."  Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

### 3.    Danger-Creation Exception.

Second, the Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct."  Uhlrig v. Harder, 64 F.3d at 573.

The danger-creation exception applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." Currier v. Doran, 242 F.3d at 923. See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm."). Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573. A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'" Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)). To state a prima facie case, a plaintiff must show that his or her danger-creation claim for due process violations meets a six-part test: (i) the State and individual actors must have created the danger or increased the plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) the defendant must have acted recklessly in conscious disregard of that risk; and (vi) such conduct, when viewed in total, shocks the conscience. See Peña v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm. See Christiansen v. City of Tulsa, 332 F.3d at 1281. A defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk." Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1496 (10th Cir. 1992). The intent to place a person unreasonably at risk

is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences." Medina v. City & Cnty. of Denver, 960 F.2d at 1496 (citations omitted).

### 4.    Government Conduct That Shocks the Conscience.

A government actor's official conduct intended to injure in a way that no government interest reasonably can justify most likely shocks the conscience. See Cty. of Sacramento v. Lewis, 523 U.S. at 849)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d at 1222 (quoting Moore v. Guthrie, 438 F.3d at 1040). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d at 574).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Peña v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force does not shock the conscience even if

the suspect does not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and because the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)(unpublished))).   In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the corrections officer's widow sued the department of corrections' director, deputy director, warden, and deputy wardens, alleging that the defendants deliberately fail to ensure proper training and supervision of penitentiary personnel, fail to provide safe and adequate staffing, and fail to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates. See 265 F.3d at 1132.  The district court concludes that the plaintiff fails to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions are "not of such a magnitude that the Court is able to conclude they shock the conscience." Martinez v. Uphoff, 265 F.3d at 1134.  The Tenth Circuit agrees with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking standard."   265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. 2010)(Browning, J.), the plaintiffs allege that the defendants -- a school district, superintendent, principal, and vice principal of a middle school -- violate the plaintiffs' substantive due process rights when they did not take sufficient action to prevent a student at the school from "racking"[3] the plaintiffs' son.  Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d at 1072-73.  The

---

[3]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles."  Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d at 1059 n.2.

Court concludes that the defendants' conduct does not shock the conscience. See 716 F. Supp. 2d at 1074-75. The Court explains:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate. Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.
>
> While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .
>
> Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## **RELEVANT LAW REGARDING EXIGENT CIRCUMSTANCES**

Exigent circumstances may overcome "[t]he presumption of unconstitutionality for warrantless searches." United States v. Mongold, 528 F. App'x 944, 948 (10th Cir. 2013)(unpublished). Exigencies may arise from threats to a person's physical safety, the likely destruction of evidence, and the "'hot pursuit,'" United States v. Mongold, 528 F. App'x at 948 (quoting Kentucky v. King, 563 U.S. at 460), of suspects, see United States v. Mongold, 528 F. App'x at 948 (citing Kentucky v. King, 563 U.S. at 460). In such situations, "'the exigencies . . . make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" United States v. Mongold, 528 F. App'x at 948 (alteration in original)(quoting Kentucky v. King, 563 U.S. at 460, and citing United States v.

Martinez, 643 F.3d 1292, 1296 (10th Cir. 2011)).

"'The existence of exigent circumstances is a mixed question of law and fact.'" United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992)). "The government bears the burden of proving that exigent circumstances rendered a warrantless search reasonable." United States v. Martinez, 643 F.3d at 1296 (citing United States v. Anderson, 154 F.3d at 1233). "'[W]hen the exception must justify the warrantless entry of a home,'" the government's burden is "'especially heavy.'" United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Najar, 451 F.3d at 717).

The Tench Circuit notes an "emergency assistance exigency exception" when an exigency involves a "risk of personal danger." United States v. Najar, 451 F.3d 710, 718, 721 (10th Cir. 2006). The government must satisfy a two-part test: "'(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable,'" United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Najar, 451 F.3d at 718). The Tenth Circuit adopted this test after the Supreme Court, in Brigham City v. Stuart, 547 U.S. at 406-07, held that the officers' subjective motivations are irrelevant and that probable cause is unnecessary for the emergency-aid exception. See United States v. Najar, 451 F.3d at 718. This holding upturned the Tenth Circuit's earlier three-part test, which required that "'the search must not be motivated by an intent to arrest or seize evidence,'" and that "'there must be some reasonable basis, approaching probable cause, to associate the emergency with the place to be searched.'" United States v. Najar, 451 F.3d at 718 (quoting United States v. Thomas, 372 F.3d 1173, 1177 (10th Cir. 2004)). Accordingly, now, to satisfy "[t]he emergency aid exception," the government must demonstrate "'an objectively reasonable basis for believing that a person within the house is in need of

immediate aid,' not on an officer's subjective belief." United States v. Martinez, 643 F.3d at 1296 (quoting Michigan v. Fisher, 558 U.S. 45, 47 (2009)).[4]

The Supreme Court recently updated its position on the community caretaking exception to the Fourth Amendment's warrant requirement in Caniglia v. Strom, 593 U.S. 194 (2021)("Caniglia"). Writing for the Supreme Court, the Honorable Clarence Thomas, Associate Justice of the Supreme Court, holds that police officers' caretaking functions -- such as welfare checks -- do not "create[] a standalone doctrine . . . justif[ying] warrantless searches and seizures in the home." Caniglia, 593 U.S. 194 at 194. Justice Thomas stresses that, without a warrant or the homeowner's consent, police officers cannot enter a home -- even for non-investigatory purposes -- unless "recognized exigent circumstances were present," such as a need to "'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'"

---

[4]The Tenth Circuit's test for the destruction-of-evidence exception, however, still requires probable cause. See United States v. Mongold, 528 F. App'x at 949 (applying the test from United States v. Aquino, 836 F.2d 1268 (10th Cir. 1988), for the destruction-of-evidence exception, which includes a probable cause requirement). Cf. United States v. Najar, No. CR 03-0735 JB, 2004 WL 3426123, at *6 (D.N.M. Sept. 3, 2004)(Browning, J.)("For probable cause in the usual sense not to be needed, the police must be responding to a true emergency rather than a crime, and the police must reasonably believe a person inside needs immediate assistance, and entry is needed to protect or preserve life, or to avoid serious injury." (emphasis in original)), aff'd, 451 F.3d 710 (10th Cir. 2006). In the Tenth Circuit, the government must meet a four-part test for such an exception:

> An exception to the warrant requirement that allows police fearing the destruction of evidence to enter the home of an unknown suspect should be (1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse.

United States v. Aquino, 836 F.2d at 1272. "The second element includes two components: (a) the exception is only available for serious crimes; and (b) destruction of evidence must be likely." United States v. Mongold, 528 F. App'x at 949.

- 49 -

Caniglia, 593 U.S. 194 at 198 (quoting Kentucky v. King, 563 U.S. 452, 460, 470 (2011)).

The Supreme Court thus limits the possible scope of Cady v. Dombrowski, 413 U.S. 433 (1973), in which it holds that an officer's warrantless search of an impounded vehicle for a firearm did not violate the Fourth Amendment.  See Cady v. Dombrowski, 413 U.S. at 447-48.  Justice Thomas emphasizes that, in Cady v. Dombrowski, the defendant's vehicle is "already under police control," and stresses the "'constitutional difference'" between searches of vehicles and searches of homes.  Caniglia, 593 U.S. 194 at 198-99 (quoting Cady v. Dombrowski, 413 U.S. 433, 439).  In Caniglia, police officers search the plaintiff's home and seize two firearms after conducting a "welfare check" on the plaintiff, who is suicidal.  Caniglia, 593 U.S. 194 at 194.  Justice Thomas explains that, although the officers are performing initially a "community caretaking" function rather than an investigatory function, their warrantless search and seizure is not Constitutional.  Caniglia, 593 U.S. 194 at 198-99.  Justice Thomas clarifies that, under the Fourth Amendment, police officers only may "inva[de] . . . the home and its curtilage" where they possess

> a valid warrant.  See Collins v. Virginia, 138 S. Ct. 1663 (2018) . . . .  We have also held that law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to "'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" Kentucky v. King, 563 U.S. 452, 460, 470 (2011); see also Brigham City v. Stuart, 547 U.S. 398, 403-04 (2006)(listing other examples of exigent circumstances).  And, of course, officers may generally take actions that "'any private citizen might do'" without fear of liability.  E.g., Jardines, 569 U.S. at 8 (approaching a home and knocking on the front door).

Caniglia, 593 U.S. 194 at 198.  Justice Thomas continues that the "community caretaking" exception does not apply to home searches, concluding that it serves as a "recognition that police officers perform many civic tasks in modern society . . . , a recognition that these tasks exist, and not an open-ended license to perform them anywhere."  Caniglia, 593 U.S. 194 at 199.

Three justices concurred.  See 593 U.S. 194 at 199-205.  The Honorable John Roberts,

Chief Justice of the United States of America -- with whom the Honorable Stephen Breyer, Associate Justice of the Supreme Court, joins -- writes a one-paragraph concurrence.  See Caniglia, 593 U.S. 194 at 1600 (Roberts, C.J., concurring, Breyer, J., joining).  Chief Justice Roberts states that he joins Justice Thomas' opinion, because it does not contradict the proposition that "[a] warrant to enter a home is not required . . . when there is a 'need to assist persons who are seriously injured or threatened with such injury.'"   Caniglia, 593 U.S. 194 at 1600 (Roberts, C.J., concurring)(quoting Brigham City v. Stuart, 547 U.S. at 403).

In his concurrence, the Honorable Samuel Alito, Associate Justice of the Supreme Court, suggests a number of issues that he believes Justice Thomas' opinion leaves unresolved.  See Caniglia, 593 U.S. 194 at 200-04 (Alito, J., concurring).  Justice Alito agrees with the Supreme Court that Cady v. Dombrowski does not recognize a freestanding "community caretaking" Fourth Amendment category, noting that "community caretaking" tasks "vary widely, and there is no clear limit on how far they might extend in the future."  Caniglia, 593 U.S. 194 at 200 (Alito, J., concurring).   Justice Alito notes two issues implicating the Fourth Amendment that Justice Thomas' holding does not address: (i) temporary seizures "conducted for the purpose of ascertaining whether a person presents an imminent risk of suicide"; and (ii) "red flag" laws with which States are experimenting that empower police officers, upon a court order, to seize a firearm that its owner may use to harm herself or another person.  Caniglia, 593 U.S. 194 at 201 (Alito, J., concurring).  Echoing concerns that Chief Justice Roberts expresses during oral argument about elderly persons injured in their homes and reachable only by a warrantless search, Justice Alito suggests that the current exigent circumstances doctrine does not cover such a situation.  See Caniglia, 593 U.S. 194 at 203-04 (Alito, J., concurring).  Justice Alito writes that "circumstances are existent only when there is not enough time to get a warrant . . . and warrants are not typically

granted for the purpose of checking on a person's medical condition."  Caniglia, 593 U.S. 194 at 203-04 (Alito, J., concurring)(citing Missouri v. McNeely, 569 U.S. 141, 149 (2013); Michigan v. Tyler, 436 U.S. 499, 509 (1978)).

The Honorable Brett Kavanaugh, Associate Justice of the Supreme Court, writes the third and final concurrence.  See Caniglia, 593 U.S. 194 at 204 (Kavanaugh, J., concurring).  Justice Kavanaugh explains how, contrary to Justice Alito's suggestion, the exigent circumstances doctrine supplies justification for warrantless entry into the home to ascertain the medical state of elderly persons and suicidal persons.  See Caniglia, 593 U.S. 194 at 206-07 (Kavanaugh, J., concurring).  Justice Kavanaugh opines that, when police officers receive a call about a woman threatening imminent suicide in her home, they have "'an objectively reasonable basis' for believing than an occupant is 'seriously injured or threatened with such injury.'"  Caniglia, 593 U.S. 194 at 207 (Kavanaugh, J., concurring)(quoting Brigham City v. Stuart, 547 U.S. at 400, 403).  The Fourth Amendment, Justice Kavanaugh writes, "does not require officers to stand idly outside as the suicide takes place."  Caniglia, 593 U.S. 194 at 207 (Kavanaugh, J., concurring).  Justice Kavanaugh concludes that the result is the same when a concerned relative requests that police officers perform a welfare check on an elderly man and where the man does not respond to their knock on the door: "[T]he officers have an 'objectively reasonable basis' for believing that an occupant is 'seriously injured or threatened with such injury,'" and "[t]he Fourth Amendment does not prevent the officers from entering the home and checking on the man's well-being."  Caniglia, 593 U.S. 194 at 207-08 (Kavanaugh, J., concurring)(quoting Brigham City v. Stuart, 547 U.S. at 400, 403).

## LAW REGARDING QUALIFIED IMMUNITY

Under the doctrine of qualified immunity, government officials performing "discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  When a defendant asserts qualified immunity, therefore, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Est. of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020).  A right is clearly established when it is "sufficiently clear that every reasonable official employee would have understood that what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012).

In the Tenth Circuit, until recently, this rule meant that a right is clearly established only when there is a factually similar "Supreme Court or Tenth Circuit decision on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." Truman v. Orem City, 1 F. 4th 1227, 1235 (10th Cir. 2021)(quoting Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014)). The Supreme Court recently suggested, however, that a plaintiff need not, in every situation, point to a case that is sufficiently factually similar.  See Taylor v. Riojas, 592 U.S. 7, 8-9 (2020)("Taylor")("[N]o reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time.").  The Tenth Circuit has understood Taylor to clarify that it is no longer the case that an almost-identical case must exist for a constitutional violation to be clearly established.  See Truman v. Orem City, 1 F. 4th at 1241 ("Just like any reasonable corrections officer should have

understood the inmate in Taylor's conditions of confinement offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."). The Court proceeds with both lines of analysis:

> An officer therefore is entitled to qualified immunity unless a plaintiff can demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established either (a) by a factually similar Supreme Court or Tenth Circuit case on point, see Thomas v. Kaven, 765 F.3d at 1194, or, in rare cases, by "general constitutional principles," Routt v. Howry, 835 F. App'x. at 382 -- at the time of the alleged misconduct, or (b) because the conduct was "particularly egregious" such that "any reasonable officer should have realized" it was unlawful, Taylor, 141 S. Ct. at 54[, 592 U.S. at 9].

Caldwell v. Univ. of N.M. Bd. of Regents, No. CIV 20-0003, 2023 WL 4236016, at *36 (D.N.M. June 28, 2023)(Browning, J.).

To evaluate a motion to dismiss on the grounds of qualified immunity, "a court must consider 'whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" Leverington v. City of Colo. Springs, 643 F.3d 719, 732 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)). The Tenth Circuit "uses the same standard in evaluating dismissals in qualified immunity cases as to dismissals generally." Shero v. City of Grove, 510 F.3d 1196, 1200 (10th Cir. 2007). Because qualified immunity "is an immunity from suit rather than a mere defense to liability," Serna v. Colo. Dep't of Corr., 455 F.3d 1146, 1150 (10th Cir. 2006), "the claim is dismissed" where the "plaintiff's allegations, if true" cannot "establish a constitutional violation," Shero v. City of Grove, 510 F.3d at 1204.

<u>ANALYSIS</u>

The Court concludes that Lowrey has not stated a claim for violations of his federal Constitutional rights under the Fourteenth Amendment, the First Amendment, or the Fourth Amendment.  The individually named County Defendants in their individual capacities are entitled to qualified immunity.  Lowrey has not stated a claim for violations of his State Constitutional rights under the NMCRA.  Accordingly, the Court grants the Motion.

## I.   **LOWREY DOES NOT STATE A FOURTEENTH AMENDMENT CLAIM FOR VIOLATION OF HIS RIGHT TO EQUAL PROTECTION.**

Lowrey asserts equal-protection claims against Castaneda and Crespin.  <u>See</u> Complaint at 3, 7.  Generally, to state a claim under § 1983 for violation of the Equal Protection Clause, a plaintiff must show that he or she is a member of a class of individuals who is being treated differently from similarly situated individuals who are not in that class.  <u>See</u> <u>SECSYS, LLC v. Vigil</u>, 666 F.3d 678, 688 (10th Cir. 2012).  Lowrey does not allege that he is a member of a class of individuals who is being treated differently from similarly situated individuals who are not in that class.  Consequently, Lowrey does not state a cognizable equal protection claim under § 1983.

## II.   <u>**LOWREY DOES NOT STATE A FIRST AMENDMENT RETALIATION CLAIM.**</u>

Lowrey asserts First Amendment retaliation claims against Castaneda and Crespin.  <u>See</u> Complaint at 3, 8.  The elements for a First Amendment retaliation claim against a defendant who is not the plaintiff's employer are: (i) that the plaintiff "was engaged in constitutionally protected activity"; (ii) that the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (iii) that the "defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."   <u>Worrell v. Henry</u>, 219 F.3d 1197, 1212 (10th Cir. 2000)(quoting <u>Lackey v. Cnty. of Bernalillo</u>, 166 F.3d 1221, at *3).

Here, Lowrey first alleges that he engaged in constitutionally protected activity.  "Speech" for First Amendment purposes includes spoken or written word, as well as conduct that possesses sufficient communicative elements.  See Animal Legal Defense Fund v. Kelly, 9 F.4th 1219, 1227 (10th Cir. 2021).  Lowrey alleges that, in 2021, he contacted the Sandoval Sheriff's Office to report Regan for "7 years worth of false reports" "and constant harassment," and abuse of the legal process.  Complaint ¶¶ 12-14, at 4.  Then, in 2022, he filed a child abuse report against Regan. See Complaint ¶ 136, at 15.  Lowrey's conduct is sufficiently communicative to be protected speech.  Second, Lowrey has not alleged that the County Defendants' actions caused a chilling effect on his protected speech, nor does he allege any intent to continue engaging in protected speech.   Third, Lowrey does not allege that his protected speech "substantially motivated" Castaneda and Crespin's actions.  Complaint ¶¶ 11-104, at 3-12; Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000).  To the contrary, Lowrey alleges that the County Defendants performed a welfare check at Lowrey's home in response to 911 calls and not in response to Lowrey's protected speech.  See Complaint ¶¶ 31, 40-41, at 5-6.  Consequently, Lowrey does not state a cognizable First Amendment retaliation claim under § 1983.

## III.   LOWREY DOES NOT STATE FOURTH AMENDMENT CLAIMS REGARDING THE SEARCH OF HIS PROPERTY AND THE SEIZURE OF HIS SON.

Lowrey asserts claims for unreasonable search and seizure against Castaneda, Crespin, Sanchez and Wilcken.  See Complaint at 3, 8, 34.  Exigent circumstances may overcome "[t]he presumption of unconstitutionality for warrantless  searches," and "[e]xigencies may arise from threats to a person's physical safety."   United States v. Mongold, 528 F. App'x 944, 948 (10th  Cir. 2013)(unpublished).  "[T]he exigencies . . . make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." United States v. Mongold, 528 F. App'x at 948.  Under the emergency assistance exigency exception,

the Tenth Circuit requires that the government satisfy a two-part test when an exigency involves a "risk of personal danger," United States v. Najar, 451 F.3d at 718: "'(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable,'" United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Najar, 451 F.3d at 718).

Here, Lowrey alleges that the CYFD Defendants made multiple 911 calls requesting that the County Defendants perform a welfare check on Lowrey's 6-year-old child.  See Complaint ¶ 31, at 5.  Sanchez completed a walk through of Lowrey's home, and, after deeming the child and home safe, did not remove the child from the home.  See Complaint ¶¶ 40-43, at 5-6.  Lowrey's alleged facts thus satisfy the Tenth Circuit's two-part test from United States v. Martinez for the emergency assistance exigency exception to apply.  First, the CYFD Defendants' 911 calls to the County Defendants give the County Defendants an objectively reasonable basis to believe that they need to enter Lowrey's home to protect the child's safety.  See Complaint ¶ 31, at 5.  Although Lowrey alleges that the 911 calls include false allegations, see Complaint ¶ 31, at 5, the Tenth Circuit has held consistently that law enforcement can rely on information from other officers to establish reasonable suspicion and probable cause.  See Albright v. Rodriguez, 51 F.3d 1531, 1536 (10th Cir. 1995)("Officers may rely on information furnished by other law enforcement officials to establish reasonable suspicion.")(citing United States v. Maestas, 2 F.3d 1485, 1493 (10th Cir. 1993)); Oliver v. Woods, 209 F.3d 1179, 1190 (10th Cir. 2000)("Police officers are entitled to rely upon information relayed to them by other officers in determining whether there is reasonable suspicion to justify an investigative detention or probable cause to arrest.").  The County Defendants' reliance on the 911 calls from the CYFD Defendants therefore objectively are reasonable.  Nor does Lowrey allege any facts showing why the County Defendants' reliance is

unreasonable.  Second, the County Defendants conducted a reasonable search in the manner of a walk-through of Lowrey's home, because Lowrey "politely obliged" the search, and he does not allege any other facts showing that the walk through was unreasonable.  Complaint ¶ 40, at 6. Lowrey does not state a Fourth Amendment search-and-seizure claim under § 1983, because his alleged facts show that the emergency assistance exigency exception applies.

## IV.   LOWREY DOES NOT STATE A FOURTEENTH AMENDMENT CLAIM FOR INTERFERENCE OF HIS PARENTAL RIGHTS.

Lowrey asserts claims for interference with the parent/child relationship against Castaneda and Crespin.  See Complaint at 3, 8.  The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law . . . ."  U.S. Const. amend. XIV, § 1.  Children have a Constitutionally protected liberty interest in a relationship with their parents, and vice versa:

> [C]hoices to enter into and maintain certain familial human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty.

Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984).    See Trujillo v. Bd. of County Comm'rs, 768 F.2d 1186, 1189 (10th Cir. 1985)(holding that a parental relationship is a constitutionally protected liberty interest).  "'Th[e] right to familial association is grounded in the Fourteenth Amendment's Due Process Clause.'"   Cordova v. City of Albuquerque, 816 F.3d at 654 (quoting Lowery v. County of Riley, 522 F.3d 1086, 1092 (10th Cir. 2008)).

> To prevail on a familial-association claim, a plaintiff must make two showings: (1) that the defendants intended to deprive [him or her] of [his or her] protected relationship," and (2) that balancing the individual's interest in the protected familial relationship against the state's interests in its actions, defendants either "unduly burdened plaintiff['s] protected relationship, or effected an unwarranted intrusion into that relationship."

Cordova v. City of Albuquerque, 816 F.3d at 654-55 (quoting Thomas v. Kaven, 765 F.3d 1183, 1196 (10th Cir. 2014))(alterations added).   The Tenth Circuit holds, however, that "not every statement or act that results in an interference with the right of familial association is actionable. The conduct or statement must be directed at the familial relationship with knowledge that the statements or conduct will adversely affect that relationship."   Cordova v. City of Albuquerque, 816 F.3d at 654-55 (internal quotation marks and citation omitted).   To satisfy the first prong of the familial-association substantive due-process test, then, a plaintiff must allege the defendant had the "intent to interfere" with a particular protected relationship.   Cordova v. City Of Albuquerque, 816 F.3d at 654-55 (internal quotation marks and citation omitted).   As to the balancing analysis that the second prong requires, "'the court will consider, among other things, the severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action.'"   Cordova v. City of Albuquerque, 816 F.3d at 654-55 (quoting Thomas v. Kaven, 765 F.3d at 1196).

> To determine whether a person's familial association rights have been violated in this factual setting, we must weigh two factors: the state's interests in investigating reports of child abuse, . . . [and] [the plaintiff's] interests in . . . familial right of association.   Initially, we examine these factors objectively, that is, outside of the facts or subjective positions of the parties.   Nonetheless, we do not evaluate constitutional rights in a vacuum.   Ultimately, we must examine the parties' interests in light of the facts of this particular case.

Griffin v. Strong, 983 F.2d 1544, 1547 (10th Cir. 1993).   "[T]he state of New Mexico has a strong interest in investigating allegations of child abuse."   Payne v. Wilder, 2017 WL 3600454 *46 (D.N.M.)(Browning, J.).

The Complaint's allegations do not show that Castaneda and Crespin imposed an undue burden on Lowrey's relationship with his child, because Castaneda and Crespin did not physically remove the child from Lowrey's custody during the welfare check.   Crespin's infringement of

familial rights of association, by directing Lowrey take the child to La Petite Daycare the next day, is slight, resulting only in a minor disruption in Lowrey and his child's lives.  Consequently, Lowrey does not allege a Constitutional violation of his substantive-due-process rights to familial association.

## V.   LOWREY DOES NOT STATE A FOURTEENTH AMENDMENT CLAIM FOR SUPPRESSION AND FABRICATION OF EVIDENCE.

Lowrey asserts claims for suppression evidence against Castaneda and Crespin, and for fabrication of evidence against Crespin.  See Complaint at 3-4, 7-8.  It appears that Lowrey's claim for suppression of evidence against Castaneda is based upon Castaneda's failure to submit evidence to the District Attorney ("DA"), which resulted in the DA dropping Lowrey's case against Regan.  Complaint ¶¶ 26-29 at 5.  There are no factual allegations in the Complaint alleging that Castaneda's failure to submit evidence to the DA violated a right that the Constitution or United States laws secured.  See West v. Atkins, 487 U.S. 42, 48 (1988)( "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.").  Lowrey, consequently, does not state a Fourteenth Amendment claim for suppression of evidence under § 1983 against Castaneda.

Lowrey alleges:

> Crespin, being fully briefed by Castaneda on the 133 pages of evidence which were used to charge Defendant Regan with false report and harassment, knowing that his two deputies had already deemed Plaintiff's child safe, knowing that Mosely lied to him about the allegations on the unsigned safety plan, knowing that RRPD verified that there was no active investigation into Plaintiff regarding his son, and knowing that the RRPD did not plan to schedule a safe house interview, suppressed that information and fabricated evidence to effectuate the unlawful seizure of the child.

Complaint ¶ 103, at 12.  Crespin did not remove Lowrey's child during the walk-through welfare check.  See Complaint ¶ 98, at 11.  The Court concludes that Crespin's instruction that Lowrey must take his child to La Petite Daycare the next day resulted in only in a minor disruption in Lowrey and his child's lives, which does not establish a Constitutional violation of Lowrey's substantive due process rights to familial association.

## VII.   THE COUNTY DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY, BECAUSE LOWREY HAS NOT ESTABLISHED ANY VIOLATION OF HIS CONSTITUTIONAL RIGHTS.

The Court must next determine whether the County Defendants are entitled to qualified immunity for all claims against them in their individual capacity.  See Harlow v. Fitzgerald, 457 U.S. 800, 817–818 (1982) (holding that the common law doctrine of qualified immunity applies to public officials sued in individual capacities); Owen v. Independence, 445 U.S. 622, 635–636 (1980) (holding that qualified immunity is personal defense that does not apply to institutional defendants under federal statutes).  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her Constitutional or statutory right; and (ii) that the right was established clearly at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).  Lower courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  Pearson v. Callahan, 555 U.S. at 236-37.  Here, the Court begins by determining whether the individually named Defendants violated any constitutional rights.  See Green v. Padilla, 484 F. Supp. 3d 1098, 1133 (D.N.M. 2020)(Browning, J.).  The Court concludes that the County Defendants are entitled to qualified immunity on those claims because as to the second element, Lowrey has not established that any

of the County Defendants' actions violate any right clearly established under the United States Constitution.  In an independent analysis of the caselaw, as to the first element, the Court also has been unable to find a Tenth Circuit or Supreme Court case that is similar to this case that suggests the law is clearly established that the County Defendants violated clearly established law.  Thus, Lowrey does not satisfy either prong of the qualified immunity analysis.

## VII.   LOWREY DOES NOT STATE A CLAIM UNDER THE NMCRA.

Lowrey asserts claims against Castaneda, Crespin, Sanchez, and Wilcken pursuant to the NMCRA, N.M.S.A. §§ 41-4A-3; 41-4A-12.  Complaint at 3-4, 8, 34.  Each of Lowrey's NMCRA claims are pursuant to the New Mexico Constitution's analogue of the United States Constitution. See Complaint at 12-13, 21-22, 32-33.  The NMCRA provides:

> A.     A public body or person acting on behalf of, under color of or within the course and scope of the authority of a public body shall not subject or cause to be subjected any resident of New Mexico or person within the state to deprivation of any rights, privileges or immunities secured pursuant to the bill of rights of the constitution of New Mexico.
>
> B.     A person who claims to have suffered a deprivation of any rights, privileges or immunities pursuant to the bill of rights of the constitution of New Mexico due to acts or omissions of a public body or person acting on behalf of, under color of or within the course and scope of the authority of a public body may maintain an action to establish liability and recover actual damages and equitable or injunctive relief in any New Mexico district court.

N.M.S.A. § 41-4A-3.

As Sandoval County Sheriff's Office employees, the County Defendants are persons acting on a public body's behalf.  Lowrey, therefore, can assert NMCRA claims against the County Defendants in New Mexico district court.  See Complaint ¶¶ 3-5, at 2; N.M.S.A. § 41-4A-3.[5]  The

---

[5]When a plaintiff sues a State in federal court, the State can invoke two immunities: (i) Eleventh Amendment immunity from suit, which is a jurisdictional bar that prevents a federal court from hearing the case; and (ii) sovereign immunity from liability, which is a substantive

defense. See Trant v. Oklahoma, 754 F.3d 1158, 1172 (10th Cir. 2014). First, a State must waive its Eleventh Amendment immunity for a plaintiff to sue the State in federal court. See Bishop v. John Doe 1, 902 F.2d 809, 810 (10th Cir. 1990). Courts will conclude that a State waives its Eleventh Amendment immunity by statute only when the State does so "by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction." Edelman v. Jordan, 415 U.S. 651, 673 (1974)(quoting Murray v. Wilson Distilling Co., 213 U.S. 151, 171 (1909)). Courts also will conclude that a State waives its Eleventh Amendment immunity when it removes the case to federal court. See Lapides v. Board of Regents of University System of Georgia, 535 U.S. 613, 624 (2002)(holding that "removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive" Eleventh Amendment immunity in federal court). Finally, because Eleventh Amendment immunity is jurisdictional, a State can assert it at any time, and the Court can raise the issue sua sponte. See Nelson v. Geringer, 295 F.3d 1082, 1098 n. 16 (10th Cir. 2002)("[J]udicial consideration of Eleventh Amendment issues sua sponte is discretionary, not mandatory."). If a State does not raise the issue, however, a Court can ignore it. See Wisconsin Dept. of Corrections v. Schacht, 542 U.S. 381, 389 (1998).

The County Defendants are not, however, State actors for the purposes of these immunities. Eleventh Amendment immunity applies not only to a State but also to an entity that is the State's arm. See Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002). See also Kentucky v. Graham, 473 U.S. 159, 169 (1985)(holding that Eleventh Amendment immunity is "in effect when State officials are sued for damages in their official capacity"); Brandon v. Holt, 469 U.S. 464, 471 (1985)("[A] judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents . . . .")( internal quote has no citation). The Supreme Court, however, "has repeatedly refused to extend [Eleventh Amendment] immunity to counties." Northern Ins. Co. of New York v. Chatham Cty., 547 U.S. 189, 193 (2006). Accord Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977) (holding that Eleventh Amendment immunity "does not extend to counties and similar municipal corporations"). County officers sued for damages in their official capacity generally are not entitled to Eleventh Amendment immunity. See Couser v. Gay, 959 F.3d 1018, 1022-1023 (10th Cir. 2020). The Supreme Court concludes, however, that a county sheriff's office can be entitled to Eleventh Amendment immunity under certain circumstances. See, e.g., McMillian v. Monroe County, 520 U.S. 781, 785-86 (1997)(concluding that the Alabama county sheriff's office is a State actor for purposes of a § 1983 claim). Cf. Couser v. Gay, 959 F.3d 1018, 1023 (10th Cir. 2020)(concluding that the Kansas county sheriff's office is a county actor and thus is not entitled to Eleventh Amendment immunity).

The Tenth Circuit applies a four-factor test to determine whether a defendant official, such as a sheriff, is a State or local actor. See Steadfast Ins. Co. v. Agricultural Ins. Co., 507 F.3d 1250, 1253 (10th Cir. 2007)("Steadfast"). The factors are: (i) the character ascribed -- such as an agency of the state -- to the defendant under State law; (ii) the autonomy accorded the defendant under State law; (iii) the defendant's finances; and (iv) whether the [defendant] is concerned primarily with local or State affairs. See Steadfast, 507 F.3d at 1253.

In Couser v. Gay, the Tenth Circuit applies Steadfast's four-factor test to conclude that Kansas sheriffs are county actors and not State actors, and therefore do not have Eleventh Amendment immunity. See 959 F.3d at 1023-1031. First, the Kansas Constitution does not mention the sheriff's office, but rather authorizes the Kansas Legislature to provide for county and

township officers, including the sheriff; Kansas courts also find the county liable for a sheriff's tortious acts.  See Couser v. Gay, 959 F.3d at 1026-7.  Second, Kansas sheriffs have autonomy from State oversight, because Kansas law does not grant State actors, such as the governor or attorney general, authority over a Kansas sheriff's law enforcement functions.  See Couser v. Gay, 959 F.3d at 1028.  Third, the county has control over the sheriff's salary and auditing authority over the sheriff's books.  See Couser v. Gay, 959 F.3d at 1029.  Fourth, the Kansas sheriff's law enforcement responsibilities are limited to the sheriff's county, and the sheriffs are elected at the county level.  See Couser v. Gay, 959 F.3d at 1030.

The Supreme Court in Couser v. Gay distinguishes the case from McMillian v. Monroe County, 520 U.S. 781, 785-86, (1997), where the Supreme Court concludes that an Alabama sheriff is a State official for purposes of a § 1983 claim.  In McMillian v. Monroe County, the Supreme Court relies mainly on Alabama's unique constitutional history, in which its 1819 Constitution lists sheriffs in the State "executive department."  520 U.S. at 787-88.  The Supreme Court also notes that the Supreme Court of Alabama had determined counties lack respondeat superior liability for a sheriff's tortious acts in his official capacity.  See McMillian v. Monroe County, 520 U.S. at 788-89.  Specifically as to the third factor, the Supreme Court notes that the Alabama sheriffs are treated as State court employees, because under the Alabama Code, when Alabama sheriffs carry out non-law enforcement duties for the judicial system, "the presiding circuit judge 'exercise[s] a general supervision' over the county sheriffs in his circuit, just as if the sheriffs are normal 'court [i.e., State] employees.'" McMillian v. Monroe County, 520 U.S. at 790 (brackets in original)(citing Ala. Code. § 12-17-24 (1995)).

The County Defendants, here, are most similar to the Kansas county sheriff's office who are county actors in Couser v. Gay, rather than the Alabama county sheriff's office who are State actors in McMillian v. Monroe County.  First, the New Mexico Constitution mentions the county sheriff in Art. X., under County and Municipal Corporations; it makes no mention of the county sheriff in Article V, under Executive Department.  See NM Constitution Art. X, V.  Specifically, the Constitution mentions the sheriff to establish that he or she is elected to a four-year term.  See NM Constitution, Art. X § 2.  Further, like in Kansas, the Supreme Court of New Mexico holds that respondeat superior extends NMTCA liability to public entities that have supervisory control over tortious actors.  See Silva v. State, 1987-NMSC-107, ¶ 15, 106 N.M. 472, 476-77, 745 P.2d 380, 385, limited on other grounds by Archibeque v. Moya, 1993-NMSC-079, 116 N.M. 616, 866 P.2d 344.

Second, New Mexico county sheriffs operate largely independently of the State in carrying out its law enforcement function, as New Mexico law does not have any provision that grants State actors authority over the sheriff's law enforcement functions, unlike in Alabama.  Third, the New Mexico Constitution empowers the New Mexico Legislature to fix salaries for county sheriffs.  N.M. Const. Art. X, Sec. 1.  The county has control over all county official salaries, including the county sheriff's office, and auditing authority.  See N.M. Const. Art. X, Sec. 1.  The State Legislature is responsible for fixing a cap on salaries of county sheriffs.  See N.M.S.A. § 4-44-1.  Fourth, however, New Mexico county sheriffs' law enforcement responsibilities can extend across the State.  N.M.S.A. § 4-41-12 provides that sheriffs

> have the right to enter any county of this state, or any part of this state, for the purpose of arresting any person charged with crime, whether the county so entered

be the same to which the sheriff so entering was elected or not; and the deputies of said sheriffs shall have the same power as is conferred on the sheriffs, and any sheriff entering any county as above mentioned, shall have the same power to call out the power of said county to aid him, as is conferred on sheriffs in their own counties.

Three of the four factors support concluding that New Mexico sheriffs are county actors: (i) New Mexico Constitutional and statutory law lists sheriffs as county officers; (ii) sheriffs have autonomy from the State in their law enforcement functions; and (iii) the county controls the sheriff's salary and books. These three factors outweigh (iv) the sheriffs have State-wide authority to conduct their law enforcement responsibilities. The Court, therefore, concludes that the County Defendants are county actors, not State actors, and are thus not entitled to Eleventh Amendment immunity from Lowrey's claims.

Even if the County Defendants were State actors, Eleventh Amendment immunity is not dispositive in this case. Even if the State waives Eleventh Amendment immunity, such as through removal to federal court, the State and its local governments and officials "enjoy[] another kind of sovereign immunity that it may invoke [. . . ] -- immunity from liability." Trant v. Oklahoma, 754 F.3d at 1172. See Fed. Mar. Com'n v. South Carolina State Ports Auth., 535 U.S. 743, 752 (2002)("The Eleventh Amendment does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity."). The NMCRA waives New Mexico and its local government's sovereign immunity when the plaintiff brings NMCRA claims in "any New Mexico district court." N.M.S.A. § 41-4A-3(B). The Court could entertain the concept that this language includes the United States District Court of the District of New Mexico, but using a plain language analysis, the better interpretation is that the Legislature intends "New Mexico district court" to mean New Mexico State district court. N.M.S.A. § 41-4A-3. At least two other judges in this district agree with the latter interpretation. See Valdez v. Grisham, 559 F. Supp. 3d at 1181 ("This waiver, however, is limited to actions commenced in 'any New Mexico district court.'")(quoting N.M.S.A. § 41-4A-3(B)); O'Flaherty v. United States Marshals Serv., 2024 WL 3342520, at *2 ("The New Mexico Civil Rights Act does not waive the State's sovereign immunity for suits brought in federal court."). The language of "district court" is similar to the language of the New Mexico Tort Claims Act, N.M.S.A. §§ 41-4-1 through 41-4-30, which even more strongly suggests the law is limited to State courts. See N.M. S.A. § 41-4-18A ("Exclusive original jurisdiction for any claim under the Tort Claims Act shall be in the district courts of New Mexico."); id. at § 41-4-4F (stating that nothing in prior subsections shall constitute "waiver of the state's immunity from suit in federal court under the eleventh amendment"). The Court agrees that the Legislature intends to waive sovereign immunity only for cases "maintain[ed]" in State district court. N.M.S.A. § 41-4A-3(B). The issue here, then, is whether New Mexico has waived or can waive its and its local government's sovereign immunity -- the immunity from liability -- from NMCRA claims brought in federal court, and what the Court shall do with all the NMCRA claims in its cases.

The Court concludes that it has jurisdiction over the NMCRA claims brought in federal court. It has supplemental jurisdiction, and the State cannot divest the federal court of jurisdiction that Congress has given it. See Stewart v. Ferer, 163 F.2d 183, 185 (10th Cir. 1947)(Bratton, J.)("[T]he judicial power of the United States is created by the Constitution and

_____

provided by Congress pursuant to its constitutional authority.  The exertion of that power may not be abridged, limited, or rendered inefficacious by action of the several states."); GeoMetWatch Corp. v. Hall, No, 1:14-CIV-00060-JNP-PMW, 2019 WL 430886, at *6 (D. Utah Feb. 4, 2019)(Parrish, J.)("The jurisdiction of federal courts is governed by the Constitution and Congress. State statutes cannot affect a federal court's subject matter jurisdiction."), aff'd sub nom. GeoMetWatch Corp. v. Behunin, 38 F.4th 1183 (10th Cir. 2022).  That conclusion follows from the Constitution's supremacy and the fact that federal law is supreme.  See U.S. Const. Art. VI.  If New Mexico does not assert its sovereign immunity, the Court will treat the NMCRA claims in its cases like any other State-law claims.  The Court will not raise the sovereign immunity issue sua sponte.  Cf. Wisconsin Dept. of Corrections v. Schacht, 524 U.S. at 389 (discussing Eleventh Amendment immunity and concluding: "Nor need a court raise the defect on its own.  Unless the State raises the matter, a court can ignore it.").  If New Mexico asserts its sovereign immunity, however, and asks the Court to dismiss the NMCRA claims, the Court will entertain the request to decline to exercise supplemental jurisdiction over the NMCRA claims first brought in federal court.  For the reasons that the Court outlines in the last paragraph of this footnote, the request likely will arise "in exceptional circumstances, [where] there are . . . compelling reasons for declining jurisdiction," 28 U.S.C. § 1367(c)(4), or the case and NMCRA claims fit the narrow exceptions for declination of supplemental jurisdiction set forth in § 1367(c)(1) or § 1367(c)(4).  District courts' supplemental jurisdiction is discretionary, but district courts can refuse to exercise it only under certain stated, specific circumstances, including "exceptional circumstances" where there are "compelling reasons" to decline jurisdiction. 28 U.S.C. § 1367(c).  Federal district courts can decline to exercise supplemental jurisdiction over state law claims depending on "the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims."  City of Chicago v. International College of Surgeons, 522 U.S. 156, 173 (1997).  The Court concludes that there may be compelling reasons to dismiss without prejudice the NMCRA claims that plaintiffs bring in federal court if the government entities so request.  The NMCRA, enacted in 2021, is a relatively recent statue that concerns important issues of State law.  See N.M.S.A. §§ 41-4A-1 through 41-4A-13.  While the Court has the power to exercise jurisdiction over the NMCRA claims that plaintiffs bring in federal court, it will entertain a State or local government's request to decline to exercise supplemental jurisdiction over them.  If the Court declines to exercise supplemental jurisdiction over these claims, the plaintiff will have to pursue the NMCRA claims in a parallel State law case.

Here, the County Defendants do not assert sovereign immunity from the NMCRA claims -- nor can they, since they are not State actors.  The Court, therefore, treats the NMCRA claims like any other State law claims, exercises supplemental jurisdiction over them, and decides the merits of the claims.  The State and local government entities can waive their sovereign immunity.  State and local government sovereign immunity is not jurisdictional.  Again, the Court will not raise sovereign immunity sua sponte.  If the State and local government entities do not raise the issue, the Court will proceed and treat the NMCRA claims like any other State law claim.

If the State and local government defendants remove the case from State district court to federal court, the Court will consider this "New Mexico district court" issue waived.  While the Eleventh Amendment immunity cases are not controlling, they are instructive.  If the State and local government defendants remove the case from a State district court, they should not be able

Court has supplemental jurisdiction over Lowrey's State law claim, because the NMCRA claims

arise out of the same case or controversy as his federal Constitutional claims.  See 28 U.S.C. §

1367.[6]

--------------------------------

to argue that the NMCRA claims that they have just removed can only be litigated in State district court.  The plaintiff did what the NMCRA told the plaintiff to do: bring the NMCRA claims in State court.  It is the State or local government entities who removed the NMCRA claims to federal court.  The language, "may maintain an action . . . in any New Mexico district court," N.M.S.A. § 41-4A-3(B), does not expressly preclude the plaintiff from maintaining the claims in federal court where the State or local government defendants remove the case.

> The state shall not have sovereign immunity for itself or any public body within the state for claims <u>brought pursuant to the New Mexico Civil Rights Act</u>, and the public body or person acting on behalf of, under color of or within the course and scope of the authority of the public body provided pursuant to the New Mexico Civil Rights Act <u>shall not assert sovereign immunity as a defense or bar to an action</u>.

N.M.S.A. § 41-4A-9 (emphasis added).  Once the plaintiff has attempted to maintain his or her NMCRA claims in State court, the State or local government entities cannot raise the "New Mexico district court" language as a defense against the claims.

While the Court wants to be correct and consistent, there are pragmatic reasons why this issue that the Court is agonizing over may not be much of an issue.  State and local government defendants often prefer to be in federal court rather than in State court.  They also often do not want two parallel cases -- one in federal court and one in State court -- proceeding on the same set of operative facts.  That reality of what is going on in federal court is the reason the Court is willing to entertain declining to exercise supplemental jurisdiction when the plaintiff brings NMCRA claims in federal court, because it likely will be an "exceptional circumstance[]" when the State does not want to be in federal court and prefer two parallel cases rather than one case.  If State and local government defendants do not do anything to try to get out of federal court, the Court is not going to do anything, sua sponte, to dismiss or remand the claims.

[6]Because federal claims against the sole remaining Defendant Jennifer Regan remain, the Court cannot dismiss all federal claims and cannot decline to exercise supplemental jurisdiction as to Lowrey's remaining state law NMCRA claim.

Were the Court to dismiss all federal claims as to all remaining Defendants, the Court would decline to exercise supplemental jurisdiction as to the NMCRA claim.  Where federal claims are dismissed before trial, the district court should decline supplemental jurisdiction over State law claims and dismiss them without prejudice.  See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a [State law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction. . . ."); Bauchman v. West High Sch., 132 F.3d 542, 549 (10th Cir. 1997)(citing Carnegie-Mellon University v.

Here, Lowrey asserts the same set of facts for both the State law NMCRA claims and the federal Constitutional claims.  The Court concludes that Lowrey has not stated any NMCRA claims for the same reasons that he does not state any federal Constitutional claims.  The Supreme Court of New Mexico previously has interpreted the New Mexico Constitution's provisions more expansively than the Supreme Court of the United States has interpreted the United States Constitution.  See State v. Nunez, 2000-NMSC-013, ¶ 13, 129 N.M. 63, 70, 2 P.3d 264, 271 ("It is settled law in New Mexico that '[w]e are not bound to give the same meaning to the New Mexico Constitution as the United States Supreme Court places upon the United States Constitution, even in construing provisions having wording that is identical, or substantially so [. . . .](ellipses added)).  The Court concludes from its independent analysis, however, that the Supreme Court of New Mexico would find that Lowrey has not stated any NMCRA claims under

---

Cohill, 484 U.S. 343, 350 (1988).  In Brooks v. Gaenzle, 614 F.3d 1213, (10th Cir. 2010), the Tenth Circuit declines to exercise jurisdiction over the plaintiff's remaining State law claim after affirming the district court's dismissal of the federal issues.  See 614 F.3d at 1229.  The Tenth Circuit explains that it generally declines to exercise jurisdiction in such instances, "because '[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.'"  Brooks v. Gaenzle, 614 F.3d at 1229 (quoting Ball v. Renner, 54 F.3d 664, 669 (10th Cir. 1995)).  When the Court dismisses a plaintiff's federal claims, it generally declines to exercise supplemental jurisdiction over a plaintiff's remaining State law claims.  See Hyman v. N.M. State Univ., 2024 U.S. Dist. LEXIS 74226 at *5 (D.N.M. March 20, 2024)(Browning, J.)(dismissing the federal claims and declining to exercise supplemental jurisdiction over the remaining State law claim); Moya v. San Juan Cnty. Adult Det. Ctr., 2022 U.S. Dist. LEXIS 23009 at *1 (D.N.M. Dec. 29, 2022)(Browning, J.)(dismissing the federal civil rights claims and declining to exercise jurisdiction over the State law claims); Parrish v. Roosevelt Cty. Bd. Of Cty. Comm'rs, 2017 U.S. Dist. LEXIS 217920 at *2 (D.N.M. March 13, 2017)(Browning, J.)(granting summary judgment on the federal Fair Labor Standards Act, 29 U.S.C. §§ 201-219, claim and declining to exercise supplemental jurisdiction over the remaining State breach-of-contract claim).  Consistent with prior holdings and the notions of comity and federalism, the Court concludes that New Mexico State court should try Lowrey's remaining State law NMCRA claim.  See Ball v. Renner, 54 F.3d 664, 669 (10th Cir. 1995).  The Court would decline to exercise supplemental jurisdiction on Lowrey's state law NMCRA claim if it were the only remaining claim.

the New Mexico Constitution's analogues on Fourteenth Amendment Due Process and Equal Protection, N.M. Const. Art. II, § 18, First Amendment Free Speech, N.M. Const. Art. II, § 17, and Fourth Amendment Searches and Seizures, N.M. Const. Art. II, § 10.

**IT IS ORDERED** that: (i) the County Defendants' Motion to Dismiss, filed October 26, 2023 (Doc. 19), is granted; (ii) the Plaintiff's claims pursuant to 18 U.S.C. § 1983 against Defendants Jonathan Crespin, Joshua Wilcken, B. Sanchez and John Castenada are dismissed with prejudice; and (iii) the Plaintiff's claims under the New Mexico Civil Rights Act, N.M.S.A. §§ 41-4A-1 through 41-4A-13, against Defendants Jonathan Crespin, Joshua Wilcken, B. Sanchez and John Castenada are dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Parties and counsel:*

Jarrod Lowrey
Rio Rancho, New Mexico

    *Plaintiff pro se*

Jennifer Regan
Rio Rancho, New Mexico

    *Defendant pro se*

Eric Loman
Dyea Reynolds
Jackson Loman Stanford & Downey, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendants Cantrell Mosley, Misty Williams, and Jennifer Bartleson*

Nicholas Autio
New Mexico Local Government Law, LLC
Albuquerque, New Mexico

*Attorney for Defendants Jonathan Crespin, Joshua Wilcken, B. Sanchez, and John Castaneda*